**STATE of Iowa, Appellant,**

v.

**Burt James SMITH, Derek Lee Smith, Blake Alan Privitt, and Jayson Randall Speaks, Appellees.**

No. 95–1077.

Supreme Court of Iowa.

April 17, 1996.

Thomas J. Miller, Attorney General, Ann E. Brenden, Douglas R. Marek, Thomas H. Miller and Virginia Barchman, Assistant Attorneys General, and James DeTaeye, County Attorney, for appellant.

Kim M. Kouf, Assistant Public Defender, Marshalltown, and Julia Keifer, Public Defender, Nevada, for appellee Burt Smith.

Steven A. Kloberdanz, Marshalltown, and Stephen M. Terrill, Ames, for appellee Derek Smith.

Patrick L. Wilson, Marshalltown, and Donald Juhl, Nevada, for appellee Blake Privitt.

Paul C. Peglow and Kevin M. O'Hare of Johnson, Sudenga, Latham, Peglow & O'Hare, Marshalltown, for appellee Jayson Speaks.

Considered en banc.

SNELL, Justice.

I. Facts and Procedural Background

On October 5, 1994, the body of Rebecca Hauser was found in a car on a county road in Iowa. She had been shot and stabbed. The subsequent investigation led law enforcement officials to four juveniles in Missouri. Three of the four juveniles were then

under the supervision of the Missouri juvenile court. Arrangements were made for Iowa officers to travel to Missouri to interview the juveniles, Burt and Derek Smith (twin brothers), Blake Privitt, and Jayson Speaks.

On October 8, 1994, Marshall County, Iowa Sheriff Tad Kamatchus and Iowa department of criminal investigation agent David Fees met with Mike Waddle, the director of juvenile court services for Missouri's second judicial district, and two Missouri juvenile probation officers. Waddle informed the Iowa officers they were in his jurisdiction and he required Missouri juvenile procedures be followed or he would not facilitate the interviews. The Iowa officers agreed to proceed under the Missouri rules.

The officers then proceeded to the juvenile center in Kirksville, Missouri. Each of the juveniles was present with his mother and was interviewed twice. Each was interviewed individually, accompanied by his mother. The initial interview was preceded by a discussion between the officers and the mother. At that time each mother was told that her son was to be interviewed regarding any information he might have relating to the killing of a woman in Iowa. Each mother orally consented to the interview of her son. Before the interviews, director Waddle read to each juvenile from a written form explaining the juvenile's rights. Each juvenile followed along on the form and initialed next to each right as it was explained to him in order to indicate he understood what he had been told.

The first interviews lasted from twenty to forty minutes. None of the boys incriminated himself beyond admitting his presence in the Marshalltown, Iowa area and possession of a small-caliber rifle. Three of the four juveniles indicated the rifle had been thrown over a bridge in Missouri before reaching Iowa. After consent by his mother and himself each boy was then fingerprinted. After the first interview, each boy was asked to remain at the center and was placed in a separate room. Food and drink were provided, and the juveniles were allowed supervised restroom breaks. At the conclusion of all four interviews, officers noted inconsistencies leading them to believe the boys had not been completely honest. The boys were again interviewed—this time in reverse order: Blake Privitt, who had been interviewed last during the first series, was interviewed first and had a twenty-minute wait between interviews. Jayson Speaks waited approximately two hours. The Smith boys waited several hours before they were interviewed the second time. During this wait, they were not allowed to speak with their mother although she had asked to speak with them. At the beginning of the second interview each boy was briefly reminded of his rights. One by one the boys made incriminating statements regarding Hauser's killing.

The four juveniles were subsequently charged in Iowa with first-degree murder and first-degree robbery. All four moved to suppress their statements as having been obtained in violation of U.S. Constitutional and Iowa statutory rights, specifically Iowa Code chapter 232 (1993). Following a hearing, the district court filed a ruling with extensive findings. The court concluded the boys were not in custody during the initial interviews and therefore no *Miranda* rights attached at that time. The court concluded, however, the custodial relationship changed following the initial interviews. Because each juvenile received *Miranda* warnings prior to the first interview, new warnings were not necessary before proceeding with the second interviews. The court next concluded that with respect to a constitutional inquiry, all the statements were voluntarily made; however, the court concluded Iowa juvenile law was applicable and the required safeguards were not satisfied during the second series of interviews. The court thus concluded the statements given following the second interviews were involuntary according to Iowa Code section 232.45. The court also concluded even if Missouri law governed rather than Iowa law, the statements were not obtained in strict compliance with either. The court ruled the written confessions obtained following the second interviews were inadmissible at trial.

Following an additional hearing, the district court rejected the State's argument that a rifle recovered by Iowa authorities would

have been inevitably discovered by lawful means. The court therefore ruled the rifle was discovered as an illegal fruit of the boys' involuntary statements and was inadmissible evidence.

Because we hold the defendants were not in custody at the time of the second series of interviews, we reverse the district court's order to suppress their written confessions. We also reverse the district court's suppression of the rifle as it is not an illegal fruit of involuntary statements. We need not reach the question of the applicability of Iowa or Missouri juvenile procedures as such safeguards do not apply in absence of a custodial situation.

## II. Custody

### A. The Reasonable Person Standard

 The initial question with which we are faced in examining defendants' challenge to the interview procedure is whether the defendants were in fact in the custody of law enforcement officials at the time of the second interviews. If the defendants were in fact in custody at this time, then they are entitled to the full complement of constitutional rights accorded by *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706 (1966). In addition, provided they were in fact in custody at the time of the second interviews, because the defendants are juveniles they would be accorded additional procedural safeguards under Iowa Code chapter 232, Missouri Code chapter 211, and Missouri Supreme Court Rules 122.01 and 122.05, the portions of the code governing juvenile justice proceedings. Because the claims raised by defendants implicate a possible violation of constitutional rights, our review of this matter is de novo. *State v. Thomas*, 540 N.W.2d 658, 661 (Iowa 1995).

The Fifth Amendment to the United States Constitution provides in relevant part, "No person ... shall be compelled in any criminal case to be a witness against himself...." U.S. Const. amend. 5. In *Miranda v. Arizona*, the Supreme Court first addressed the scope of this privilege in the situation of custodial interrogation. *Mi-*

*randa*, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. The Court there held the privilege against self-incrimination applied to informal coercion by law enforcement officers as well as it did to formal coercion and required a defendant be advised of his rights prior to any "custodial interrogation":

> the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been *taken into custody or otherwise deprived of his freedom of action in any significant way.*

*Id.* (emphasis added). The Court then set out the now familiar litany of rights of which the defendant is entitled to be reminded:

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

*Id.* In a footnote to the definition of custodial interrogation, the Court explained, "This is what we meant in *Escobedo* when we spoke of an investigation which had focused on an accused." *Id.* (citing *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964)). This statement created some confusion, however, as some courts then required *Miranda* warnings be given whenever an investigation had *focused* on the defendant without requiring a separate finding of custody. In *Beckwith v. United States*, 425 U.S. 341, 345–47, 96 S.Ct. 1612, 1615–16, 48 L.Ed.2d 1, 6–8 (1976), the Court specifically clarified the issue and held that focus of an investigation on a defendant without anything more does not require the safeguards of *Miranda*.

The *Miranda* decision left in its wake much confusion on the question of the determination of custody. The Supreme Court and most state courts faced with the question seemed to basically reiterate the *Miranda* definition of custody and then proceeded to find or not find custody based upon the facts

of the particular situation. *See Oregon v. Mathiason,* 429 U.S. 492, 494–95, 97 S.Ct. 711, 712, 50 L.Ed.2d 714, 718–19 (1977) (per curiam) (holding a parolee held at a police station for questioning was not in custody because he was free to leave at any time); *Beckwith,* 425 U.S. at 347, 96 S.Ct. at 1616, 48 L.Ed.2d at 8 (holding a suspect in a tax case not in custody when questioned at a private home); *Orozco v. Texas,* 394 U.S. 324, 327, 89 S.Ct. 1095, 1097, 22 L.Ed.2d 311, 315 (1969) (holding a defendant placed under arrest in his own bedroom was in custody as he was not free to leave); *Mathis v. United States,* 391 U.S. 1, 4–5, 88 S.Ct. 1503, 1504–05, 20 L.Ed.2d 381, 384–85 (1968) (holding a suspect questioned while incarcerated for other charges was not free to leave, and therefore was in custody).

Most cases decided in this time period analyzed custody under one of two approaches: a subjective test examining whether the particular defendant and/or the officer thought the defendant was in custody; or an objective or reasonable person test—whether a reasonable person in that situation would have thought he was in custody. Most courts looking at this issue applied the objective, reasonable person test. *See United States v. Bekowies,* 432 F.2d 8, 12 (9th Cir. 1970); *United States v. Hall,* 421 F.2d 540, 544 (2d Cir.1969), *cert. denied,* 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970); *Lowe v. United States,* 407 F.2d 1391, 1396–97 (9th Cir.1969); *Commonwealth v. O'Shea,* 456 Pa. 288, 318 A.2d 713, 715 (1974); *People v. Algien,* 180 Colo. 1, 501 P.2d 468, 471 (1972) (en banc).

In 1984 the Supreme Court revisited the question of custody for *Miranda* purposes and unequivocally adopted the objective reasonable person test as the standard in making the determination. In *Berkemer v. McCarty,* 468 U.S. 420, 422–23, 104 S.Ct. 3138, 3141, 82 L.Ed.2d 317, 324 (1984), the Court was faced with the question whether a motorist detained for a routine traffic stop was in custody so as to be entitled to the safeguards provided under *Miranda.* The Court first acknowledged that even a routine traffic stop such as the one at issue was a significant curtailment of the freedom of ac-

tion of the driver as it is a crime to refuse to stop or drive away from a policeman. *Berkemer,* 468 U.S. at 436, 104 S.Ct. at 3148, 82 L.Ed.2d at 332. The Court also explained due to this characteristic, such a stop was considered a seizure under the Fourth Amendment even though its purpose was limited and its duration brief. *Id.*

The Court further explained, however, that this fact alone does not establish custody. The Court said, "Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." *Id.* at 437, 104 S.Ct. at 3148–49, 82 L.Ed.2d at 333. The traffic stop was not one of those situations. In holding that such a stop did not result in custody, the Court explained "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Id.* at 442, 104 S.Ct. at 3151, 82 L.Ed.2d at 336. The Court stated it was inappropriate to take into consideration a "policeman's unarticulated plan" as to the future arrest of a suspect as this had no bearing on the objective belief of a reasonable person in the situation. *Id.* In reaching this conclusion, the Court relied particularly on the *Beckwith* decision, in which it stated, "It was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the Court to impose the *Miranda* requirements with regard to custodial questioning." *Id.* at 442, 104 S.Ct. at 3151, 82 L.Ed.2d at 336 (quoting *Beckwith v. United States,* 425 U.S. 341, 346–47, 96 S.Ct. 1612, 1616–17, 48 L.Ed.2d 1, 7–8 (1976)) (citations omitted).

In applying this standard, courts have examined the facts apparent in the particular case and made custody determinations on a case-by-case basis, the inquiry being whether

> in the absence of actual arrest something ... [is] said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates [to the defendant] that they would not have heeded a request to depart or to allow the suspect to do so.

*Hall,* 421 F.2d at 545. This requires examination of the totality of the circumstances with no one particular fact or factor being determinative of the issue. *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275, 1279 (1983); *United States v. Helmel,* 769 F.2d 1306, 1320 (8th Cir.1985). For instance, courts have held custody is not implicated merely because questioning takes place at the police station or the defendant is the sole subject of a police investigation. *See Beheler,* 463 U.S. at 1125, 103 S.Ct. at 3520, 77 L.Ed.2d at 1279; *Mathiason,* 429 U.S. at 493, 97 S.Ct. at 713, 50 L.Ed.2d at 718; *Jenner v. Smith,* 982 F.2d 329, 334–35 (8th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 81, 126 L.Ed.2d 49 (1993) (suspect held not to be in custody when he voluntarily went to police headquarters and was free to leave even though the interrogation lasted seven hours and the defendant was subjected to a polygraph test); *United States v. Fazio,* 914 F.2d 950, 956–57 (7th Cir.1990).

Courts have also been reluctant to find custody where a defendant is questioned voluntarily at home or in other familiar surroundings. *See Beckwith,* 425 U.S. at 345–47, 96 S.Ct. at 1615–17, 48 L.Ed.2d at 6–8; *Krantz v. Briggs,* 983 F.2d 961, 963–64 (9th Cir.1993); *United States v. Manor,* 936 F.2d 1238, 1241 (11th Cir.1991); *United States v. Jones,* 933 F.2d 807, 810 (10th Cir.1991); *United States v. Sutera,* 933 F.2d 641, 646–47 (8th Cir.1991); *United States v. Gregory,* 891 F.2d 732, 735 (9th Cir.1989); *United States v. Hocking,* 860 F.2d 769, 772–73 (7th Cir.1988).

The Eighth Circuit has also approached the custody issue on a case-by-case basis. In *United States v. Helmel,* 769 F.2d 1306, 1320 (8th Cir.1985), it explained that the court is to "consider the totality of the circumstances" including "[t]he accused's freedom to leave the scene and the purpose, place and length of interrogation...." In a later case, *Wilson v. Coon,* 808 F.2d 688, 689 (8th Cir. 1987), the court specifically indicated this test was to be performed from the perspective of a reasonable person. *See also Leviston v. Black,* 843 F.2d 302, 304 (8th Cir.), *cert. denied,* 488 U.S. 865, 109 S.Ct. 168, 102 L.Ed.2d 138 (1988) (analyzing the situation from the view point of a reasonable person in the defendant's position).

■ Our court has also utilized this approach, most recently in *State v. Scott,* 518 N.W.2d 347, 350 (Iowa), *cert. denied, Scott v. Iowa,* —— U.S. ——, 115 S.Ct. 515, 130 L.Ed.2d 421 (1994), and *State v. Deases,* 518 N.W.2d 784, 789 (Iowa 1994). In *Scott,* we examined the question whether a brief detention and pat down search of a motorist and his passenger constituted a custodial situation. In concluding such was not the case, we explained

> In determining whether an individual [is] in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.

*Scott,* 518 N.W.2d at 350 (quoting *Stansbury v. California,* 511 U.S. 318, ——, 114 S.Ct. 1526, 1528–29, 128 L.Ed.2d 293, 298 (1994)).

■ At nearly the same time, we considered *State v. Deases,* in which we examined the question whether a correctional officer's interrogation of a prisoner was custodial. *Deases,* 518 N.W.2d at 789. After first noting the appropriate test was "whether a reasonable person in the inmate's position would understand himself to be in custody," we adopted a four factor test from the Ninth Circuit as guidance in making such a determination:

> Relevant factors in making this determination include the language used to summon the individual, the purpose, place and manner of the interrogation, the extent to which the defendant is confronted with evidence of his guilt, and whether the defendant is free to leave the place of questioning.

*Deases,* 518 N.W.2d at 789 (citing *Cervantes v. Walker,* 589 F.2d 424, 428 (9th Cir.1978)); *see also United States v. Jorgensen,* 871 F.2d 725, 732 (8th Cir.1989) (Heaney, J. dissenting) (urging application of the Ninth Circuit test to a questioning which took place at F.B.I. Headquarters).

■ One additional factor is apparent in the present case which we deem worthy of

note. In none of our cases dealing with the reasonable person standard have we been faced with the situation we have presently, that is, juvenile defendants. This brings us to the question whether the reasonable person standard should take into consideration the age of the defendants.[1] In *Haley v. Ohio*, 332 U.S. 596, 597–98, 68 S.Ct. 302, 303, 92 L.Ed. 224, 227–28 (1948), the Supreme Court examined the validity of a confession of a fifteen-year-old defendant who had been held fifteen hours and questioned by police in relay teams. He was also denied access to his attorney and his mother for two days. Although the Court's inquiry in this case dealt with the Fourteenth Amendment due process implications of such a scenario, we believe the reasoning applied is relevant to our case:

> What transpired would make us pause for careful inquiry if a mature man were involved. And when, as here, a mere child—an easy victim of the law—is before us, special care in scrutinizing the record must be used.
>
> . . . .
>
> He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. This is the period of instability which the crisis of adolescence produces. A 15–year old lad . . . is a ready victim of the inquisition. Mature men might possibly withstand the ordeal. . . . But we cannot believe that a lad of tender years is a match for police in such a contest.

*Haley*, 332 U.S. at 599–600, 68 S.Ct. at 303–04, 92 L.Ed. at 228. Because we too see the danger of overwhelming a minor defendant, as has our Legislature by passing the many protections afforded juveniles in the Iowa Code, we hold it is appropriate to consider the age of the defendants as an additional factor in making a determination as to custody status.

### B. The Defendants

The district court, in ruling on the defendants' motion to suppress their confessions, performed an analysis of the totality of the circumstances surrounding the defendants' second interviews and determined the defendants were in custody for the purposes of constitutional analysis and the attendant rights under chapter 232.

The district court first held (and defendants do not challenge on appeal) that defendants were not in custody at the time of the initial interviews. The point of contention, therefore, is the series of second interviews, those in which the defendants gave the confessions at issue.

The first fact to be analyzed under the reasonable person test is the way in which the defendants were summoned to the place of the questioning. In this case, all four defendants were voluntarily brought to the juvenile center by their mothers at the request of juvenile authorities.[2] Prior to coming they were told they would be questioned regarding a murder investigation. Although coming to the center voluntarily is not alone enough to negate a finding of custody, it is indicative of the state of mind of a reasonable person in the situation. Furthermore, where a defendant's presence is involuntary, a finding of custody is much more likely. *See Mathiason*, 429 U.S. at 495, 97 S.Ct. at 714, 50 L.Ed.2d at 719; *State v. Liggins*, 524 N.W.2d 181, 186 (Iowa 1994); *State v. Little*, 421 N.W.2d 172, 173–74 (Iowa

1. In this case, the intelligence of the defendants is not at issue. Although all defendants have been held back in school, no evidence has been presented to convince us they are of substantially lower functioning than the typical juveniles of their age group such as to merit a special standard.

2. Defendants urge the fact they were on probation supports a finding of custody as they felt compelled to appear at the juvenile facility so as not to violate the terms of their probation. This is not an appropriate consideration, however, as the standard to be applied in determining the overall custodial character of the situation is that of the reasonable person in the defendant's situation, not taking into account any prior record or possible guilt of the defendant. *See United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir.1988) (explaining the focus is on the state of mind of the reasonable person—one who is neither guilty of criminal conduct and thus overly apprehensive, nor insensitive to the seriousness of the circumstances).

App.1988); *State v. Hansen,* 286 N.W.2d 163, 168 (Iowa 1979).

■ In addition, we must examine the purpose, place, and manner of the interrogation. *See Deases,* 518 N.W.2d at 789. In the instant case, the purpose of the second interviews was clearly to attempt to get the defendants to tell the truth about their involvement in the murder. It was prompted by the inconsistencies in the stories they related during the first series of interviews. In looking at this fact, however, we must keep in mind the warning of *Berkemer,* that an officer's "unarticulated plan has no bearing on the question whether a suspect [is] 'in custody' at a particular time," rather, the sole relevant inquiry is simply how a reasonable person in the defendants' position would have understood the situation. *Berkemer,* 468 U.S. at 442, 104 S.Ct. at 3151, 82 L.Ed.2d at 336.

The nature of the juvenile center, the place in which the interviews took place, clearly weighs against a finding of custody. The record shows that the interview site was not intimidating. It was described by more than one witness as being very "family-centered" and warm—not at all like a typical police station or jail. In addition, it was a completely separate facility, attached neither to any police station nor any jail. The center had recently undergone remodeling and consisted of a waiting area complete with a fish tank, a conference room, several offices to house juvenile officers, and typical restroom and break areas. The center was also recently recarpeted and refurnished following the remodeling. Additionally, the officers and other employees present on the day of the interviews were dressed casually in civilian clothes. The record also indicates that uniformed officers were not summoned until the second round of interviews was completed. These facts favor a finding that a reasonable person in the situation of the defendants would not believe himself to be in custody.

■ Another step in determining whether a reasonable person in the position of the defendants would feel as if he were in custody is to examine the manner in which the defendants were interviewed. We must examine whether a confrontational and aggressive style is utilized in questioning, or whether the circumstances seem more relaxed and investigatory in nature. *See State v. Schwartz,* 467 N.W.2d 240, 245 (Iowa 1991) (holding the atmosphere was not coercive and the questioning was not custodial); *Hansen,* 286 N.W.2d at 168. Again, an examination of the totality of the circumstances surrounding the manner of the second series of interviews reveals they were not conducted in a coercive manner. One fact of particular significance is the number of law enforcement officers taking part in the interview process. For instance, in *State v. Foell,* 512 N.W.2d 809, 812 (Iowa App.1993), our court of appeals found the defendant was not in custody when only two officers were involved, whereas in *In re J.A.N.,* 346 N.W.2d 495, 499 (Iowa 1984), we found custody to exist when numerous officers were present and many of them were visibly armed. In the case at bar, only two Iowa officers were present, and one of them, Agent Fees, was absent from the room during much of the questioning because he was helping fingerprint the other defendants. The style of questioning during the second series of interviews was clearly not coercive or threatening. The interviews themselves were rather brief in duration, lasting only from twenty to forty minutes. *See State v. Brown,* 341 N.W.2d 10, 16 (Iowa 1983) (finding no custody where the defendant was questioned intermittently for approximately two hours); *Little,* 421 N.W.2d at 173–74 (finding custody when the defendant was questioned continuously after being driven to the station by police). Testimony showed the interviews each began with a detailed reminder of the defendant's *Miranda* rights, along with a verbal explanation of their significance. The interviewer then explained to the defendant that his initial interview had some discrepancies from what the other defendants had stated, and the defendant was then urged to share the rest of the information he knew relating to the murder. During the course of these interviews, the questioners did not raise their voices, make any threats, or promise any favors or leniency. They conducted the entire interview in a calm and respectful man-

ner. Mrs. Smith herself, the mother of two of the defendants, even admitted in her testimony that neither officer used an accusatory tone toward either of her sons. Furthermore, when Mrs. Smith and Mrs. Speaks each became emotionally distraught upon learning of their sons' involvement in the slaying, the officers ended the interviews so the women could have some time to collect their thoughts.

 Defendants further urge the extent of time they were forced to wait between interviews ranging from twenty minutes for Blake Privitt to six and one-half hours for Burt Smith, transforms the situation into a custodial one. Although defendants are certainly correct in their assertion this is a relevant inquiry, such a time lapse, by itself, is not sufficient to establish a custodial situation. See People v. Forster, 29 Cal.App.4th 1746, 35 Cal.Rptr.2d 705, 709–10 (1994); People v. Baird, 155 A.D.2d 918, 547 N.Y.S.2d 740, 741 (1989); State v. Diaz, 654 A.2d 1195, 1204 (R.I.1995). Testimony presented at the hearing tended to establish the juveniles were detained for only the time period necessary to complete the interviews. It goes without saying that when the same officers are separately questioning four different individuals, there will necessarily be a gap in time during which the later questioned defendants will be forced to wait. A waiting period of this nature does not create a custodial situation.

The facts surrounding the wait tend to show it was merely a necessary procedure in order to separately interview the four defendants. The defendants were kept in separate rooms in order to prevent them from collaborating and establishing a consistent but untrue story. Additionally, the supervisory control over the defendants was minimal—they were under no type of physical restraint and were taken to wait in pleasantly furnished offices at the center. At no time were they placed in anything resembling a cell of any kind nor did any of the defendants ask or attempt to leave the building. On several occasions during the wait, the defendants were given food and restroom breaks.

Another factor which we examine is the extent to which the defendant is confronted with evidence of his guilt. Here, the facts again point us to a finding the defendants were not in custody. The officers questioning the defendants made it clear to them that their stories did not match and used this fact as a tool with which to urge the defendants to provide more information; however, no particular evidence was discussed or disclosed to the defendants. The officers merely did what they could to persuade the defendants to tell the truth.

Our final consideration in making a custody determination is the degree to which a reasonable person in the situation of the defendant would believe he was free to leave. One obvious factor we must examine is the degree of physical restraint imposed on the defendants during the interview process. See State v. Kasel, 488 N.W.2d 706, 709 (Iowa 1992) (finding custody when a defendant was forcibly returned to the interrogation room after attempting to leave); State v. Brown, 341 N.W.2d 10, 16 (Iowa 1983) (finding no custody when a defendant was subjected to no physical restraint and felt free to leave at any time). The defendants in the instant case were subjected to no physical restraint of any kind. They were allowed soda, food, and restroom breaks throughout the process; the Smith brothers were even allowed to smoke. Defendants take issue with the fact their restroom breaks were supervised; however, in this situation such monitoring was clearly warranted in order to prevent the defendants from collaborating and developing matching stories which would contaminate further interviews. Because of this danger, an officer accompanied the defendants on their restroom breaks, and the defendants were not allowed to contact one another during the course of or between the interviews. This was a minimal restriction on their actions merited by the dangers inherent in the circumstances. This was not a case where the defendants were held incommunicado or placed in a holding cell; rather, they were interviewed in an unimposing newly remodeled juvenile center.

### III. Voluntariness

The district court determined the defendants' written statements were involuntary

by operation of Iowa Code section 232.45(9). Although neither Iowa Code chapter 232 nor the procedural protections afforded juveniles under the Missouri counterpart apply here because defendants were not yet in custody at the time of the questioning, the use of the statements is limited in a constitutional sense by the requirement that they not be involuntary. This is based not only on the Fifth Amendment protections against self-incrimination and the Fourteenth Amendment due process restrictions, but also on a strong common law tradition restricting the admission of confessions in order to protect innocent defendants from conviction on the basis of an erroneous confession:

> A free and voluntary confession is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt, and therefore it is admitted as proof of the crime to which it refers; but a confession forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape when it is to be considered as the evidence of guilt, that no credit ought to be given to it; and therefore it is rejected.

*The King v. Warickshall,* 168 Eng.Rep. 234, 234 (K.B.1783).

In assessing the standard for voluntariness in cases dealing with confessions, the Supreme Court has developed a "totality of the circumstances" test in which the individual circumstances surrounding the confession are evaluated. *See Haynes v. Washington,* 373 U.S. 503, 513, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513, 521 (1963). This analysis, of course, includes a look at the effect these circumstances had on the particular defendant.

■■■■ Our court also follows a totality of the circumstances approach in which a statement is deemed voluntary if it is "the product of an essentially free and unconstrained choice, made by the defendant whose will was not overborne or whose capacity for self-determination was not critically impaired." *State v. Payton,* 481 N.W.2d 325, 328 (Iowa 1992). *See also State v. Vincik,* 398 N.W.2d 788, 790 (Iowa 1987). We have examined a number of different factors in making such an evaluation depending on the circumstances of the particular case.

These include the defendant's age, *see State v. Aldape,* 307 N.W.2d 32, 37 (Iowa 1981); the level of the defendant's prior experiences with law enforcement, *see State v. Hodges,* 326 N.W.2d 345, 348 (Iowa 1982); whether the defendant was intoxicated at the time of the statement, *see State v. Wilson,* 264 N.W.2d 614, 614–15 (Iowa 1978); whether the defendant was provided *Miranda* warnings, *see State v. Blanford,* 306 N.W.2d 93, 95–96 (Iowa 1981); the intellectual capacity of the defendant, *see State v. Reid,* 394 N.W.2d 399, 403 (Iowa 1986); whether officers acted in a deceptive manner, *see State v. Jacoby,* 260 N.W.2d 828, 832–33 (Iowa 1977); whether the defendant appeared to understand and respond to questions, *see Reid,* 394 N.W.2d at 404; the length of time of the detention and interview, *see Cullison,* 227 N.W.2d at 129; the defendant's physical and emotional reaction to the interrogation, *see Davidson,* 340 N.W.2d at 773; and whether the defendant was subjected to any physical punishment such as the deprivation of food or sleep, *see State v. Whitsel,* 339 N.W.2d 149, 154 (Iowa 1983).

The Supreme Court has also considered characteristics such as the defendant's age, *see Haley,* 332 U.S. at 599–600, 68 S.Ct. at 303–04, 92 L.Ed. at 228 (fifteen-year-old youth); physical fatigue, *see Ashcraft v. Tennessee,* 322 U.S. 143, 149, 64 S.Ct. 921, 924, 88 L.Ed. 1192, 1196 (1944); mental deficiency, *see Culombe v. Connecticut,* 367 U.S. 568, 625, 81 S.Ct. 1860, 1891, 6 L.Ed.2d 1037, 1070 (1961) (defendant classified as "moron"); level of education, *see Clewis v. Texas,* 386 U.S. 707, 712, 87 S.Ct. 1338, 1341, 18 L.Ed.2d 423, 428 (1967) (considering a defendant with a fifth grade education); and prior experience with law enforcement, *see Haynes v. Washington,* 373 U.S. 503, 514, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513, 521 (1963) (holding confession involuntary where defendant had no prior experiences with police).

■■■■ The burden here lies on the State to prove the statements were made voluntarily. *Payton,* 481 N.W.2d at 328; *Davidson,* 340 N.W.2d at 771. The State in this case certainly establishes a strong initial showing with respect to voluntariness. The defendants were all fifteen years old at the time of

their confessions, the Smiths, only one month away from their sixteenth birthday, and the other two defendants less than six months from their sixteenth birthdays. Although these defendants may lack the calculated judgment of an adult, they are not young minors, either mentally or legally. Coupled with their extensive prior experience with the system of law enforcement,[3] the age factor militates against a finding of involuntariness. *See State v. Rhomberg,* 516 N.W.2d 803, 807 (Iowa 1994); *Aldape,* 307 N.W.2d at 37.

In the instant case, the defendants were read their *Miranda* rights prior to the first series of interviews. There is nothing to suggest that the import of being advised of their rights under *Miranda* did not continue into the second interviews. The recitation of *Miranda* warnings shows not only that the officers involved were careful to observe the defendants' rights and honored them, but it also indicates defendants were alerted of their right not to speak with the officers.

Defendants make the argument that because they were all held back in school they were not now acting in a full capacity and were not fully aware of the rights to which they were entitled. We note there has been no evidence brought forth to establish the defendants actually suffer from any mental defect such as to render them less competent in this manner. Furthermore, the mere fact they have been held back in school does not convince us differently. The defendants' own testimony shows the defendants were aware of and understood the rights to which they were entitled. This is particularly established by the fact the defendants' rights were enumerated on the consent form one by one and were verbally explained to each defendant prior to the first interviews.

The remaining relevant facts, here, the length of time of the interviews and detention of defendants, the defendants' physical reactions to the interviews, and whether physical punishment was imposed, also weigh in favor of a finding of voluntariness. As we noted in the analysis of these same facts in our custody determination, the time length of the interviews and detention was not unreasonable given the officers' task of interviewing four individual suspects separately. The defendants were also never under any sort of physical punishment, threat, or deprivation.

After examining the totality of the circumstances surrounding the second series of interviews, we hold the State has sustained its burden of proof to establish the statements at issue were made voluntarily.

IV. Rifle Evidence

At the time of the interviews, State authorities were already aware the victim, Rebecca Hauser, had been shot by a .22 caliber rifle bullet. At the first interview, the defendants stated they had taken a .22 caliber rifle with them on the trip to Iowa but had thrown it over a bridge in Missouri. During the second interviews each admitted the rifle was actually thrown off a bridge in Iowa following the killing of Hauser. State authorities searched for the rifle in Marshall County, Iowa, two days after the statements were made. The rifle was found in the Iowa River near a bridge, three-quarters of a mile south of Albion, Iowa.

Defendants claim and the district court ruled the rifle was inadmissible as evidence of the crime at trial because it constituted fruit of the poisonous tree. *See Wong Sun v. United States,* 371 U.S. 471, 482–83, 83 S.Ct. 407, 414–15, 9 L.Ed.2d 441, 451–52 (1963). This argument necessarily proceeds from a preliminary finding the defendants were in custody when their statements were made and a determination the statements were unlawfully obtained and inadmissible. Because we have determined the defendants were not in custody at the time of the second interviews and their statements were voluntarily given, we hold the rifle is admissible in evidence at trial of defendants.

---

**3.** Burt Smith was on probation at the time of the interviews and had been previously charged with a firearms violation, property damage, and possession of alcohol. Derek Smith had encountered firearms charges and had been interviewed on numerous occasions. Jayson Speaks had prior charges of property damage, truancy, and felony tampering for stealing a car. Blake Privitt was then on probation for theft.

## V. Conclusion

In our de novo review, we have determined none of the defendants was in custody during the first or second interviews by the law enforcement officials of the State of Iowa. For this reason, we hold all statements given by them and the rifle subsequently discovered may be introduced in evidence of the crime at trial of the defendants.

**REVERSED AND REMANDED.**