**STATE of Iowa, Plaintiff–Appellee,**

v.

**Robert Lee BARKER, Defendant–Appellant.**

**No. 95–0955.**

Court of Appeals of Iowa.

March 28, 1997.

Linda Del Gallo, State Appellate Defender, and John M. Priester and Sharon R. Stevens, Assistant State Appellate Defenders, for appellant.

Thomas J. Miller, Attorney General, Mary Tabor, Assistant Attorney General, and Lee W. Beine, County Attorney, for appellee.

Heard by HABHAB, C.J., and HUITINK and VOGEL, JJ.

VOGEL, Judge.

Defendant Robert Lee Barker appeals the judgment and sentence entered upon his convictions for two counts of voluntary manslaughter. Following an initial delinquency petition filed in juvenile court, jurisdiction was waived to district court. Barker claims: 1) the court erred in denying his motion to suppress statements he made during the initial questioning by law enforcement and 2) the court abused its discretion in not allowing him more funds to secure various expert witnesses for his defense.

On September 25, 1994, defendant, fifteen-year-old Robert Barker, was hunting with two of his friends. Barker shot a deer and the boys followed it onto property belonging to William Isabel. Isabel and his nephew, Brett Wood, confronted the boys and lectured them about their presence on Isabel's land and their commission of various hunting infractions. Barker claimed as he and his friends started to walk away he heard a rifle being discharged. He said he was scared and when he turned around, Isabel and Wood had their guns pointing at him. Barker fired his gun four times, shooting Isabel twice and Wood twice. Both men died.

■ *I. Motion to Suppress.* Barker contends his signing of the Juvenile Waiver and Parental Consent form was not knowing, intelligent, and voluntary. Our scope of review on this issue is de novo. *State v. Smith,* 546 N.W.2d 916, 920 (Iowa 1996).

After the shootings and initial investigation, two deputies and three state troopers

went to Barker's house to take him into custody. He was told to come out of the house, directed to get down on the ground, and was hand-cuffed. Although it was a cool evening, Barker was dressed only in his boxer shorts. His father and the officers found some clothing for him to wear. Barker was questioned at his family's picnic table, in a lighted area, where he made statements about his role in the deaths of Isabel and Wood.

The factors relevant to the issue of voluntariness are set forth in Iowa Code section 232.45(9)(a)-(h) (1995):

a. Opportunity for the child to consult with a parent, guardian, custodian, lawyer or other adult.

b. The age of the child.

c. The child's level of education.

d. The child's level of intelligence.

e. Whether the child was advised of the child's constitutional rights.

f. Length of time the child was held in shelter care or detention before making the statement in question.

g. The nature of the questioning which elicited the statement.

h. Whether physical punishment such as deprivation of food or sleep was used upon the child during the shelter care, detention, or questioning.

*Id.*

Before any questioning of Barker began, Deputy Edens read the Juvenile Waiver and Parental Consent form out loud. Barkers's father was also given a copy to read. As Deputy Edens read the form to Barker, he paused after each paragraph to make sure Barker understood what he was reading and to ask if Barker had any questions. Before Barker signed the form, Deputy Edens said, "You may want to talk to your dad first before you sign this." Barker looked at his father who said, "Go ahead and sign it." The form was then signed both by Barker and his father. Barker was questioned for 42 minutes, but, after 25 minutes, the Juvenile Waiver and Parental Consent form was reviewed with Barker, renewing his waiver and his father renewing his consent.

■ The first criterion under section 232.45(9) has been met as Barker had ample opportunity to consult with his father before and during the questioning. *See State v. O'Connor*, 346 N.W.2d 8, 11 (Iowa 1984). His father was just a few feet away from him, close enough to hear all the warnings issued from the deputy and the questions posed.

With regard to the remaining criteria, we note that Barker was fifteen years, seven months old at the time of the shootings and was a sophomore in high school. While Barker's principal testified that he was not a strong student, the record does not indicate Barker lacked the requisite intelligence to understand the nature of his rights or the effect of his waiver of those rights. *O'Connor*, 346 N.W.2d at 11. The record does indicate Barker has an I.Q. of 87 which falls within the average range. Further, the record reflects Barker was apprised of his constitutional rights. The officers fulfilled their duty under *Miranda* and Iowa Code sections 232.11(2) and 232.45(9) by informing Barker that he had the right to talk to a lawyer, that he could not give up the right to a lawyer without written consent of a parent, and that he could refuse to answer any and all questions at any time and wait until a lawyer could be present.

Barker argues the officers failed to inform him that the statement may be used in adult court and that they failed to inform him of a possible transfer of the case to adult court. The *O'Connor* court held, that while this was one factor to consider in determining whether the waiver of rights was voluntary, the totality of the circumstances did not warrant a suppression of the statement in adult court, nor did it act as a *per se* bar to finding the rights waiver was voluntary. *O'Connor*, 346 N.W.2d at 11. Here, Barker's juvenile waiver contained the following language: "Anything you say can and will be used against you in a court of law." Moreover, as previously discussed, Barker's father was at his side through the entire interview and unequivocally consented to the waiver.

Barker was only detained for a matter of minutes before he was informed of his rights and he was only questioned for 42 minutes in

his own yard. Neither the questioning nor the circumstances surrounding the questioning showed any duress, punishment, or deprivation of Barker's essential needs. *See O'Connor,* 346 N.W.2d at 11. Barker's argument that he was physically uncomfortable, outside, on a cool fall evening does not warrant a reversal of the juvenile and district court denials of his motions to suppress as being "unduly coercive." In fact, there was no evidence of "unduly coercive" interrogation tactics used by the officers as Barker claims. Barker contends there were four officers situated around the picnic table where he was questioned, that one of the officers had a shotgun in his hands, and that his father was forced to stand three or four feet away, while his mother was not present.

The record does not reflect a highly intimidating atmosphere at the time of the questioning as Barker contends. Barker was in his own yard, his father was nearby listening to all questioning and consenting to the waiver. His mother was present for part of the interview. The conduct of the officers was appropriate when looking at the totality of the circumstances: The officers were there to take into custody a suspect in a double homicide and did not undermine the voluntary nature of Barker's statements. Barker was adequately advised of his constitutional rights under *Miranda* and answered the deputies questions only after a knowing, voluntary and intelligent waiver of those rights.

We affirm the trial court denial of the motion to suppress.

**II. Expert Requests.** Barker filed several motions requesting the appointment of various experts, including a private investigator, an accident reconstructionist, a self-defense expert, and a psychiatrist. We review the trial court's decision whether to grant Barker's application for state-funded investigators or experts for an abuse of discretion. *State v. Van Scoyoc,* 511 N.W.2d 628, 631 (Iowa App.1993). Additionally, to the extent the right of attaining expert witnesses falls within the sixth amendment, and to the extent Barker claims he was denied effective assistance, our review is de novo. *Van Scoyoc,* 511 N.W.2d at 630.

In reviewing each request, we recognize an indigent criminal defendant is not entitled to the appointment of an investigator or other expert services at the State's expense unless there is a finding that such services are necessary in the interest of justice. Iowa Code § 815.7 (1995); Iowa R.Crim. P. 19(4); *see State v. Woodyard,* 414 N.W.2d 654, 658–59 (Iowa App.1987) (citing *State v. McGhee,* 220 N.W.2d 908, 910 (Iowa 1974)).

*A. Private Investigator and Accident Reconstructionist.* The district court approved the payment of $250 for a private investigator. A later request for additional funds for an investigator was denied in part as there was no representation that the funds previously allowed had been expended. The court denied the request for funds to hire an accident reconstructionist. Barker argues that absent a private investigator and accident reconstructionist, he could not rebut the State's evidence concerning its investigation of the accident.

Barker relies on this court's decision in *State v. Van Scoyoc,* 511 N.W.2d 628 (Iowa App.1993), to support his claim that an accident reconstructionist was necessary for his defense. In *Van Scoyoc,* the court denied defense counsel's request for additional funds in hiring an accident reconstructionist expert to analyze the physical evidence of the road; the testimony would establish whether or not defendant was recklessly driving a van into and over a tent occupied by four campers who were subsequently killed. *See Van Scoyoc,* 511 N.W.2d at 629. However, in *Van Scoyoc,* the trial court's denial of an expert was an abuse of discretion because in denying the expert, the court "denied the defendant the most crucial evidence of the trial." *Van Scoyoc,* 511 N.W.2d at 631. Allowing the expert testimony would have provided the defendant the opportunity to offer testimony vital to a material issue in the case. *Id.*

In this case, neither the circumstances, nor the record indicate the services of a reconstructionist or additional funds for a private investigator were necessary, as the State's reconstructionist expert was not the sole and primary means of proving the

State's case. The State had other and substantial evidence to prove its case, including testimony from witnesses and an admission from Barker. Thus, if the State's case hinged entirely on the State's use of experts, then the trial court should have allowed Barker to similarly defend by allowing additional funds for using experts. However, since most of the State's proof came through other evidence, the trial court did not prejudice Barker by not allowing him additional funds with which to retain either expert.

 **B. Psychiatric Expert.** Shortly after Barker's arrest, he underwent a thirty-day psychiatric evaluation conducted by Dr. Terry Augspurger. Approximately five months later, Barker requested an independent psychiatric evaluation, to be conducted by a psychiatrist from Kansas City. The court did not allow Barker the requested funds to retain that psychiatrist, given the expense ($5000) coupled with the availability of local experts to provide a similar evaluation. The district court did grant defendant's second choice of Dr. Augspurger and allowed $1000 for his services. After reviewing many documents in the case including pretrial transcripts and depositions, Dr. Augspurger concluded it was not necessary to meet with Barker again. Barker then renewed his request to retain the Kansas City psychiatrist. The court denied the request as it appeared to the court Barker's rejection of Dr. Augspurger was based on the doctor's refusal to support Barker's defense of diminished responsibility. The trial was also scheduled to commence in about a week. We find no abuse of discretion of this ruling.

Barker's request for a self-defense expert was granted and the court authorized $1500 for payment. Barker subsequently filed a motion indicating the individual he had intended to retain was not available and requesting additional funds to acquire another. There was no explanation as to what had become of the initial $1500 and the request was denied.

■ While an indigent defendant's right to effective assistance includes the right to public payment for reasonable expert services— which the court was willing to provide here— Iowa courts have been "unwilling to say an impecunious defendant is entitled to anything which a wealthy one could purchase." *State v. Walters,* 426 N.W.2d 136, 140 (Iowa 1988). We find the trial court did not abuse its discretion with respect the request for additional funds to retain experts, nor did it abuse its discretion in not allowing certain experts to be retained by Barker. We further find no violation of Barker's sixth amendment rights.

Having considered all the issues on appeal, we affirm Barker's convictions.

**AFFIRMED.**