**IN THE COURT OF APPEALS OF IOWA**

No. 3-1102 / 13-0409
Filed February 5, 2014

**LAWRENCE W. HAMBY,**
    Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
    Respondent-Appellee.
_____

Appeal from the Iowa District Court for Bremer County, Rustin T. Davenport, Judge.

Lawrence Hamby appeals from the denial of his application for postconviction relief. **AFFIRMED.**

Wallace L. Taylor, Cedar Rapids, for appellant.

Thomas J. Miller, Attorney General, Linda J. Hines, Assistant Attorney General, and Kasey E. Wadding, Bremer County Attorney, for appellee State.

Heard by Potterfield, P.J., and Doyle and Bower, JJ.

**POTTERFIELD, P.J.**

Lawrence Hamby appeals from the denial of his application for postconviction relief. He argues he was provided ineffective assistance of counsel when his trial lawyers failed to move to suppress statements he made to police during four interviews and when his appellate counsel failed to appeal the denial of his motion for new trial. We affirm.

## I. Facts and Proceedings.

This is the second time we have heard Hamby's case on appeal. We set forth the facts as written in the direct appeal here.

> On January 18, 2006, Michelle Otterbein received a call from her husband telling her that Nate McKinney, the son of his best friend Frank McKinney, had called him. Otterbein's husband told her Nate said Frank was dead and lying on the floor in Nate and Frank's home. Otterbein's husband asked her to go to the McKinneys' house right away. When she arrived, she found Nate walking around in the backyard talking on a cell phone that looked like Frank's cell phone. Nate told her he had called 911. She went into the house and found Frank dead on the living room floor.
>
> At approximately 1:00 p.m., a paramedic arrived on the scene. The paramedic examined Frank's body and found no pulse or signs of breathing. The paramedic found that the body was cold and starting to stiffen. The paramedic noted that there was some kind of coagulated blood in the corner of Frank's mouth and some marks around Frank's neck and facial area. Thereafter, law enforcement officers and the medical examiner arrived. The medical examiner evaluated the body and determined the death was suspicious.
>
> An autopsy was performed, and the medical examiner concluded Frank's death was a homicide, caused by trauma to the head, neck, and chest. Nine ribs had been fractured, and his face was beaten. Frank had also been strangled, and there were ligature marks on his neck from the strangulation.
>
> Nate was interviewed by police, and his clothes were confiscated at the interview. Nate initially told police he discovered his father on the floor that morning. He told police that he had played video games with his friend and neighbor, Lawrence Hamby, the previous day. He also stated that he had taken Hamby's live-in girlfriend, Jenifer Meana, to the hospital the

previous night and that Hamby had been out of town fixing a friend's computer.

After the interview, Nate went to stay with an uncle. He discussed Frank's death with his family members. The next day, Nate told his family that he "couldn't cover for that dude anymore." Nate called the detective working on the case and told them that he had lied for Hamby.

. . . .

After receiving Nate's new statement, police conducted two searches of Hamby's home. In the basement, the officer found a syringe and needle, an empty syringe package, a pill bottle, and a plastic bag full of needles and syringes. On the main floor, the officer found a bottle of Everclear. The officers later found a belt and a bat in a cupboard in Hamby's kitchen. Another officer found a black and orange extra-large t-shirt, a red rag or cloth, and a small baseball bat underneath the stairway leading to the second level of the home. Another belt was found on Hamby's bedroom floor.

Hamby was interviewed by the police. Although he admitted he was present at Frank's house prior to and after Frank's death, he denied killing Frank. Hamby told the police that he leaned over Frank's body to determine if he was alive.

On April 24, 2007, Lawrence Hamby was charged with murder in the first degree, in violation of Iowa Code section 707.2(1) (2007). Prior to trial, Hamby filed a motion in limine to exclude evidence of his probation-parole status, among other things. A jury trial commenced on January 6, 2009.

Nate testified that he had initially lied to the police, as Hamby had asked. He testified he had then come clean and gave his account of the events, as recounted above. Nate also testified that he and his father had a rocky relationship. Nate admitted he had previously stolen money and drugs from Frank. Nate testified he was positive that he did not go home while Meana was at the hospital, and that he was not at home between 9:45 and 10:30 p.m. that evening.

Meana testified she thought Nate had been wearing different pants than the ones confiscated by the police. She testified that Nate took her to the hospital for her migraine and that he had stolen needles, syringes, and other supplies from the hospital. She testified he had left her room to smoke and to make a few calls. She testified she was awake off and on in her treatment room, and that Nate had been asleep in her room too. She testified that after she and Nate returned to her and Hamby's house, she checked her messages on her cell phone that she had left at home. She testified she had one from Hamby asking where they were and to pick up the phone. She did not recognize the phone number and said the number aloud. Nate recognized it as his father's number.

She testified that Hamby came home frantic and told Nate that his dad was dead. He told Nate that his dad had worn a wire to a drug deal. She testified that Nate wanted to call the police, but Hamby told him that the police would think Nate killed his father. Hamby had Frank's phone when he returned to the house. She testified that she saw Hamby and Nate bring stuff over from Nate's house. She testified that Hamby told her to tell the police that Hamby was out of town that evening fixing a friend's computer. She testified that she initially told the police what Hamby had told her to tell them, but that she eventually told them the truth.

The medical examiner testified that the ligature marks on Frank's neck were consistent with one of the belts seized from Hamby's house. A criminalist with the Iowa Department of Criminal Investigation testified that Frank's DNA was discovered on the belt, and a blood stain on Frank's t-shirt matched the DNA of Hamby.

Nurses testified that they had seen Nate at the hospital that evening. The officer who pulled Meana over testified that the stop occurred at approximately 11:30 p.m. on the 17th.

. . . .

Hamby did not take the stand, and in his defense, he attempted to indicate Nate had killed Frank. Otterbein testified that Frank was constantly afraid of Nate, and Frank's brother-in-law testified that Nate did not cry or seem upset after Frank died. Another neighbor testified that she believed she saw Nate walking across her driveway on the night of Frank's death at around 9:30 p.m.

On January 22, 2009, the jury found Hamby guilty as charged. Hamby later filed a motion for a new trial, arguing the evidence was insufficient to support the jury verdict. The court denied Hamby's motion.

*State v. Hamby*, No. 09–0749, 2010 WL 1577367 at *1–3 (Iowa Ct. App. 2010).

Our court affirmed Hamby's conviction, finding sufficient evidence supported the conviction, the district court properly denied Hamby's motion for a mistrial after his parole status was disclosed to the jury in a witness's answer, and no prosecutorial misconduct occurred.

Hamby filed an application for postconviction relief on March 9, 2012. He argued his trial counsel was ineffective in not moving to suppress his statements to investigators and in not allowing him to testify. He argued his appellate

counsel was ineffective in failing to raise the issue of the trial court's denial of his motion for new trial and in failing to appeal the admission of certain telephone records. During the postconviction proceedings, he decided not to pursue the arguments regarding the phone records and failure to testify. Trial was held on the remaining two issues raised in the application on December 6, 2012. On February 26, 2013, the district court entered an order denying Hamby's application. He appeals.

## II. Analysis.

On appeal, Hamby argues two points. First, he argues his trial counsel was ineffective in failing to move to suppress statements he made to investigators without being given *Miranda* warnings. *See United States v. Miranda*, 384 U.S. 436, 444 (1966). Second, he argues his appellate counsel was ineffective in failing to appeal the trial court's denial of his motion for new trial.

We review claims of ineffective assistance of counsel de novo. *State v. Ondayog*, 722 N.W.2d 778, 783 (Iowa 2006). "To prove a claim of ineffective assistance of counsel, [Hamby] must show by a preponderance of the evidence that his trial counsel failed to perform an essential duty and prejudice resulted." *Id.* at 784. "We will not find counsel incompetent for failing to pursue a meritless issue. To demonstrate prejudice for ineffective-assistance purposes, [Hamby] must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Brothern*, 832 N.W.2d 187, 192 (Iowa 2013) (internal citations and quotation marks omitted).

### A. *Statements made to investigators*.

Hamby first argues his statements during the first four interviews to investigators should have been suppressed because they were obtained in violation of his Fifth Amendment rights.

Hamby's trial counsel testified in the postconviction proceedings that he did not pursue a motion to suppress Hamby's statements to investigators because he believed Hamby was not in custody during the questioning at issue and therefore strategically determined the statements supported his theory of the case—that Nate committed the murder. We avoid second-guessing counsel's strategic decisions where the decision is reasonable. *Everett v. State*, 789 N.W.2d 151, 158 (Iowa 2010).

> Generally, "ineffective assistance is more likely to be established when the alleged actions or inactions of counsel are attributed to a lack of diligence as opposed to the exercise of judgment." *Ledezma v. State*, 626 N.W.2d 134, 142 (Iowa 2001). "[M]ere mistakes in judgment normally do not rise to the level of ineffective assistance of counsel." *Id.* at 143.
>> [C]laims of ineffective assistance involving tactical or strategic decisions of counsel must be examined in light of all the circumstances to ascertain whether the actions were a product of tactics or inattention to the responsibilities of an attorney guaranteed a defendant under the Sixth Amendment.
>
> *Id.* However, not all tactical or strategic decisions shelter an attorney from a claim of ineffectiveness. *Id.*

*Anfinson v. State*, 758 N.W.2d 496, 501 (Iowa 2008). Counsel's strategic decision was made only after counsel concluded that Hamby was not in custody during the four interviews, and that a motion to suppress would be unsuccessful since *Miranda* did not apply. *See* 384 U.S. at 444 (holding the procedural safeguards for questioning apply only where a suspect is subject to custodial

interrogation). We therefore look to whether Hamby was in custody during each interview. We apply our four-factor custodial test:

> The *Miranda* opinion provides that a suspect is in custody upon formal arrest or under any other circumstances where the suspect is deprived of his or her freedom of action in any significant way. 384 U.S. at 444 . . . . In determining whether a suspect is "in custody" at a particular time, we examine the extent of the restraints placed on the suspect during the interrogation in light of whether "a reasonable man in the suspect's position would have understood his situation" to be one of custody. We apply this test objectively. In making our determination, we consider the following four factors:
> > (1) the language used to summon the individual;
> > (2) the purpose, place, and manner of interrogation;
> > (3) the extent to which the defendant is confronted with evidence of [his] guilt; and
> > (4) whether the defendant is free to leave the place of questioning.

*State v. Ortiz*, 766 N.W.2d 244, 251–52 (Iowa 2009) (internal citations omitted).

*1. First interview.* The first interview took place at the local police station on January 18, 2006, at 5:25 p.m. Hamby was told by Meana that the police wished to speak with him. The record is unclear whether Hamby initiated contact with law enforcement or vice versa, but Hamby proceeded to the station of his own volition. *See State v. Miranda*, 672 N.W.2d 753, 759 (Iowa 2003) (noting confrontation initiated by officers is more likely to be custodial). Hamby argues that the circumstances of his summons to the police station were undermined by his probation status; that he feared his probation would be revoked by refusing to go speak with police. Our supreme court has rejected this argument. *State v. Smith*, 546 N.W.2d 916, 923 n.3 (Iowa 1996); *see also Oregon v. Mathiason*, 429 U.S. 492, 500 (1977) (holding a coercive environment,

including parolee status, does not transform an otherwise noncustodial situation into one in which *Miranda* applies).[1]

The interview took place at the police station; the interview transcript discloses Hamby and Agent Callaway (an investigator from the Department of Criminal Investigation (DCI)) were present.[2] At one point, another unknown person is heard on the recording, speaking with the officer about an administrative matter. The noise of the station operations is evident in the background of the recording. The tone of the interview was casual—the officer admitted he was not entirely familiar with the area and was looking to Hamby to provide background about the circumstances surrounding Frank's death. The interview was short, lasting approximately forty minutes. Hamby was asked at one point why Nate might report something different than Hamby as to whether Hamby went to Frank's house with him. Hamby responded that Nate probably just wanted to keep him out of the matter. The interview ended with the police officer asking Hamby if it would be okay to call if he had any further questions to ask. Hamby responded that would be fine and left the station.

Given our four-factor test, we conclude a reasonable person in Hamby's position during this interview would not have thought himself in custody. *See*

---

[1] Justice Stevens's pointed dissent in *Mathianson* shows the weakness in this position: "[A] parolee is technically in legal custody continuously until his sentence has been served. Therefore, if a formalistic analysis of the custody question is to determine when the *Miranda* warning is necessary, a parolee should always be warned." 429 U.S. at 500 (Stevens, J., dissenting).

[2] Hamby's testimony during the postconviction proceeding was that during the first encounter, he was interviewed by three or four officers, including a detective Cain. He also testified he was threatened with probation revocation during this interview. The interview recordings belie this testimony.

*Ortiz*, 766 N.W.2d at 251. Hamby's Fifth Amendment rights were not violated during the first interview. *See id.*

2. *Second interview.* The second interview took place the evening after the first interview at the police station. Callaway and DCI Agent Alan Scholle were present for the interview. Hamby was interviewed in the same room as the night before, which Scholle noted on the recording was rather small. The officers asked Hamby about inconsistencies between Nate's report of the events that night and Hamby's account to Callaway the night before. Hamby recounted his story, this time with additional questions from Callaway and Scholle to clarify discrepancies between Nate and Hamby's stories. During these statements, Hamby revealed that Nate brought contraband to Hamby's house that night, and volunteered to give the items to the agents. The agents reminded Hamby that they were not interested in drug issues; they were interested in the circumstances surrounding the homicide.

At several points the agents told Hamby his story did not match what Nate told them. Almost forty-five minutes into the interview, Scholle told Hamby that Nate "[must be] dropping the dime on [Hamby]" with his story that Hamby and Nate went over to Frank's together during the night and that Hamby could get in trouble as a result. Hamby vehemently denied going over to the house and accused the agents of trying to intimidate him. The agents responded that they were not trying to intimidate Hamby or accuse him of anything; they wanted to find the truth about what happened that night. They asked Hamby to sit back down and continue to talk with them. At this point, Hamby began to tell the

agents about Nate's request to use his car to "ditch the body" and about Frank's connections with a methamphetamine dealer in town.

About an hour and fifteen minutes into the interview, Hamby was again asked why his story was different than at the first interview. In response, Hamby volunteered to take the investigators to his house and retrieve the items he told the agents Nate brought to his home. The agents again asked him to sit back down and continue talking with them. About one hour and forty-five minutes into the interview, Hamby told the agents he wanted to stop the interview and go to bed, that if the agents wanted to come to his house, they should come, but Hamby wanted to go home. Callaway told him to sit down. Shortly thereafter, Hamby told the agents, "We're done. We're done." Agent Callaway responded, "I don't think so. Sit down. We're not done." The questioning continued for another fifteen minutes. Hamby told the agents that both he and Nate owned baseball bats, his house contained a couple of "crank pipes" he made for Nate, and Hamby agreed to sign a waiver for the search of his home. Hamby then returned to his home.

We return to the four-factor test. *See id.* at 251–52. Hamby voluntarily returned to the station, the agents thanked him for coming to the station for a second time. The questioning proceeded much like the first interview; in the same office with one additional officer. The door to the room was shut. The questions did focus on discrepancies in Hamby's story, but when Hamby asked whether the agents were "calling him a liar" they responded that was not true. Though at one point Scholle stated Nate was implicating Hamby, no other reference was made to Hamby as a suspect for the homicide. Hamby instead

made statements indicating he believed he was there to implicate Nate. Regarding the last factor, Hamby clearly thought he could leave until he was told otherwise at about an hour and forty-five minutes into this interview. *See id.* at 252. At this point, when Hamby was not permitted to leave, we agree with Hamby that a reasonable person in his position would believe he was in custody. *See id.* at 251. We therefore conclude the statements made by Hamby during the last fifteen minutes of this interview were obtained in violation of his Fifth Amendment rights. *See id.* We also consider, then, if questioning in later interviews was based on answers obtained during the last fifteen minutes of questioning.

     *3.*     *Third interview.* The third interview took place the next day at city hall. Hamby was familiar with the space because he attended Alcoholics Anonymous group meetings there. Hamby began the interaction with his account of the evening. Agent Scholle reminded Hamby that his story was not matching up and not to cover for his friend. At no point was Hamby confronted with evidence of his guilt. Scholle asked most of the questions, DCI agent Jeff Jacobson asked a few questions towards the end of the interview. The questioning lasted less than two hours. Hamby came and left of his own accord, and seemed overall to be comfortable and in control of the room. While again Hamby was asked about differences in his story, he was not presented with evidence of his own guilt. We conclude he was not in custody during the third interview. *See id.*

     *4.*     *Fourth interview.* The next day, Hamby was again called to the city hall for questioning. Agents Callaway and Jacobson conducted the interview.

Hamby was very upset because a friend had been seriously injured in a fire. Agent Jacobson said, "Okay, well if you wanna do this later, we can do that. There's no sense sitting here . . . sitting in here like this if you don't feel like talking to us." Hamby declined the offer. Hamby again went over the events of the night of the murder, and then discussed local drug dealers with Jacobson. Hamby also felt free to take a cigarette break about forty-five minutes into the interview (at about noon). After the break, the agents told him Nate was blaming him for the murder. Jacobson asked what would happen if they could not place Hamby at his friend's house that afternoon. The questioning became more pointed, Jacobson told Hamby he was not being totally honest, and not telling the truth was eating Hamby alive. Hamby persisted in his story, and Jacobson told Hamby:

> Something happened there that you know more about this than meets the eye . . . . Because right now it looks like both of you are involved, both of you in that house and both of you did something. Now if you wanna keep dinkin' around with it that's fine, but we're not gonna stop.

Hamby began crying, and Jacobson continued to press him for answers. Jacobson stated, "There's so many things there that don't make sense . . . and it's convinced me more that you were there . . . . It's lookin' like you guys are the type of person that'd just go in there and beat the hell out of an old man." Shortly thereafter, at 12:50 p.m., the interview ended with Jacobson reporting that Hamby told him he was going to meet with his attorney.

The record is clear that during the first hour or so of questioning, Hamby was in a familiar and comfortable location, voluntarily agreed to stay, was not presented with evidence of guilt, and felt comfortable taking a cigarette break.

After the break, the questioning intensified and Hamby was presented with evidence that his friend Nate blamed him for the homicide. The investigator, however, did not go so far as to actually blame Hamby for the murder. Instead Hamby believed he was being told to point the finger at Nate. To the extent the agent stated the evidence appeared to support Hamby's involvement, the accusation was minimal in the context of the two-hour interview. Ultimately, Hamby felt free to call his attorney and end the interview. While the custodial nature of this part of the interview is a closer call, we conclude under our four-factor test that he was not in custody. *See id.*

Hamby does not claim counsel should have moved to suppress his fifth interview with police, as he was read his rights as required under *Miranda* and was accompanied by his attorney. *See* 384 U.S. at 444. During this interview, Hamby again told his account of the events, this time reporting that Nate confessed to Hamby that he killed Frank.

Because we did find some of Hamby's statements were obtained in violation of his Fifth Amendment rights, we must consider (regardless whether failing to move to suppress was a breach of an essential duty) whether Hamby was prejudiced by the admission of the statements into evidence. *See Millam v. State*, 745 N.W.2d 719, 722 (Iowa 2008). In order to establish prejudice, Hamby must show that but for the deficiency, there is a reasonable probability the outcome of the case would have been different. *See id.* This reasonable probability must be sufficient to undermine our confidence in the outcome of the case. *Id.*

Hamby claims generally that he was prejudiced by the failure to move to suppress his statements because "[e]ven though Mr. Hamby never admitted guilt, his statements were used against him in the County Attorney's final argument [to show] . . . the statements are inconsistent, so the defendant is lying, and he is therefore guilty." He points to testimony by his trial counsel that his "statements being admitted into evidence was very significant to the outcome of the case." During every interview, Hamby was asked about the events surrounding Frank's death. During each subsequent interview, his story changed. Looking to the first interview, the first portion of the second interview, the third interview, the fourth interview, and the fifth interview, the prosecutors were given more than enough fodder to support their theory of Hamby's unreliable account of the day. The short period of the second interview following the officers' refusal to allow Hamby to leave was not emphasized by the prosecutors and any inconsistencies in those minutes were cumulative to the rest of the inconsistent statements. We find no prejudice in counsel's failure to move to suppress the statements. *See id.*

### B. Motion for new trial.

Hamby next argues his appellate counsel was ineffective for failing to raise the denial of his motion for new trial on direct appeal. We utilize the same two-pronged test to evaluate the effectiveness of appellate counsel as we do for trial counsel. *Ledezma*, 626 N.W.2d at 142.

On direct appeal, Hamby's trial counsel argued his conviction was not supported by sufficient evidence. Hamby argues the better issue for appeal would have been a challenge to the denial of his motion for a new trial.

> When deciding [a motion for new trial], the district court is entitled to weigh the evidence and consider the credibility of the witnesses. If the court determines the verdict is contrary to the weight of the evidence and a miscarriage of justice may have occurred, it is within the court's discretion to grant a new trial. The weight-of-the-evidence analysis is much broader than a sufficiency-of-the-evidence analysis in that it involves questions of credibility and refers to a determination that more credible evidence supports one side than the other. Only in the extraordinary case, where the evidence preponderates heavily against the verdict, should a district court lessen the jury's role as the primary trier of fact and invoke its power to grant a new trial.

*State v. Maxwell*, 743 N.W.2d 185, 193 (Iowa 2008) (internal citations and quotation marks omitted). When reviewing a trial court's denial of a motion for new trial, we review the trial court's ruling for abuse of discretion.

Hamby argues the district court's order denying his motion for new trial made "observations about the court's perception of the evidence . . . [that were] not supported by the actual evidence at trial." Hamby cites as examples: that Hamby was in Frank's house at the time of his death (though the timeline introduced by the State's forensic examiner covered a potential 36 hour period for time of death, that there were some inconsistencies in testimony and in phone records that were inconsistent with Hamby's guilt), that the belt that may have been the murder weapon was found in Hamby's house (though Nate was involved in its transport), that Hamby's DNA was found on the body (though Hamby testified he touched Frank's body and other DNA that did not belong to Hamby was found under Frank's fingernails), that Hamby's inconsistent statements to the agents could reasonably be interpreted as efforts to conceal his involvement (understandable given the manner of interrogation), and that Nate was at the hospital with Meana, which was an alibi for Hamby's

noninvolvement in the murder (one witness said he saw Frank after the two would have left the hospital and the timeline was not specific enough to conclude the murder occurred while the two were at the hospital). In his supplemental motion for new trial, Hamby also submitted e-mails of jurors he characterized as indicating that the jurors put the burden of proof on Hamby (submitted not to impeach the verdict, but to show a miscarriage of justice). While some evidence may be more or less credible than other evidence, we do not find this to be such an extraordinary case "where the evidence preponderates heavily against the verdict." *Id.* The district court did not abuse its discretion in denying Hamby's motion for new trial. Hamby's ineffective-assistance-of-appellate-counsel claim is therefore without merit. *See Ledezma*, 626 N.W.2d at 141.

The district court correctly denied of Hamby's application for postconviction relief.

**AFFIRMED.**