# IN THE COURT OF APPEALS OF IOWA

No. 16-1066
Filed October 10, 2018

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**ROGER OSBORN,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Des Moines County, Mark E. Kruse, Judge.

The defendant challenges his convictions for possession of a visual depiction of a minor engaging in a prohibited sexual act. **AFFIRMED.**

Philip B. Mears of Mears Law Office, Iowa City, for appellant.

Thomas J. Miller, Attorney General, and Tyler J. Buller, Assistant Attorney General, for appellee.

Heard by Danilson, C.J., McDonald, J., and Scott, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2018).

**MCDONALD, Judge.**

Roger Osborn was convicted of twenty-six counts of possession of a visual depiction of a minor engaging in a prohibited sexual act, in violation of Iowa Code section 728.12(3) (2014). The district court ordered Osborn to serve an indeterminate term of incarceration not to exceed six years. In this appeal, Osborn challenges his convictions and sentences. In his first claim of error, he argues the district court erred in denying his motion to suppress his interview with police allegedly obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). At issue is whether the defendant was "in custody" within the meaning of the *Miranda* doctrine and whether the police were thus required to administer the *Miranda* advisories prior to interviewing him. In his second claim of error, Osborn challenges the sufficiency of the evidence supporting his convictions. In his third claim of error, he contends the district court abused its discretion in imposing sentence.

I.

In late 2014, Bryan Martin of the Missouri Cyber Crime Task Force and Internet Crimes Against Children Task Force conducted a search for unlawful content on a peer-to-peer file sharing network, ARES. Martin found six files containing visual depictions of a minor engaging in a prohibited sexual act on a computer in the network. The computer was associated with an IP (Internet Protocol) address linked to a house in Burlington. The house belonged to Carla Osborn, the defendant's mother. Martin alerted the Burlington Police Department to the potential child-exploitation offenses.

The Burlington Police Department obtained a search warrant for the house. The search warrant authorized the seizure of computers, media storage devices, and anything else that could obtain prohibited depictions. Detective Moret of the Burlington Police Department and five other law enforcement personnel executed the search warrant at the house. The officers were in plain clothes. They arrived at the Osborn residence at approximately ten o'clock in the morning and knocked on the front door. Robert Osborn ("Robert"), the defendant's father, answered the front door. One or two of the officers entered the front room while the remainder stayed outside, primarily for security reasons and because of the lack of space in the small home. At the time the officers entered the residence, Osborn was asleep. One of the officers asked Robert to wake Osborn, and Robert did so. Osborn came into the front room and spoke with the officers. Moret explained to the Osborns that the police were executing a search warrant to obtain items related to the possession of "child pornography."[1] She explained she wanted to interview them at the police station.

The parties dispute the exact language Moret used regarding the interview. At the suppression hearing, Detective Moret testified she asked Osborn if he was "willing" to come to the police station for the interview. Moret testified it was her standard practice to use this phrase. She testified Osborn did not have to agree to an interview but he did have to leave the residence while the police executed

---

[1] The witnesses used the term "child pornography." The parties use this term on appeal. Unless quoting from the record, this opinion uses the statutory terms regarding visual depictions of a minor engaging in a probited sexual act. *See* Iowa Code § 728.12(3). Use of the statutory terms is more precise and avoids any connotation that the children voluntarily participated in the creation of the visual depictions. *See* Ateret Gewirtz-Meydan et al., *The Complex Experience of Child Pornography Survivors*, 80 Child Abuse & Neglect, 238, 238 n.1 (2018).

the search warrant. Moret testified it was necessary to use the police station for the interviews because Osborn's house was too small to separate Robert and Osborn for individualized interviews. She testified the Osborns stated they were willing to be interviewed at the police station. In contrast, at the suppression hearing, Osborn testified Moret did not ask him to come to the police station for an interview but rather told him he had to come to the police station for an interview. Robert was more evasive than Osborn when pressed on the issue during the suppression hearing, but he ultimately conceded Moret may have used the word "willing" when speaking with them.

While some of the officers remained at the house to execute the search warrant, Moret drove the Osborns in her unmarked car, a regular sedan, to the police station for an interview. The Osborns sat in the back of the car. They were not handcuffed. The parties do not dispute Moret drove the Osborns to the police station, but they do dispute the circumstances under which Moret drove the Osborns to the police station. The Osborns testified they wanted to drive Robert's van to the station. Robert testified, "I said I can drive us down there, and [Moret] said, no, we will take you down in the police car." Osborn testified Moret did not give him the choice to drive. In contrast, Moret testified Robert did not want to drive to the police station because he was feeling ill. According to Moret, Robert requested she drive them to the station. Moret testified, "I told them that I would be more than willing to bring them to the police department and back to the house or anywhere else he wanted to go at that point."

Moret interviewed Osborn in a small room on the second floor of the Burlington police station while another officer interviewed Robert. The second floor

was a secured floor. Moret had to use her keycard to enter and exit the floor. Moret discussed this directly with Osborn, stating, "It is a secure floor, you saw me have to use my key, so I'd have to walk you out, but whenever we're done, we're done. Remember that, at any time." Throughout the course of the interview, the interview room was unlocked. Osborn had the freedom to leave the room at any time. At one point during the interview, Moret left the room for a few minutes, and Osborn walked out of the interview room to use the restroom. He returned to the interview room on his own.

At the beginning of the interview, Moret repeatedly told Osborn he had the right to terminate the interview and leave. Moret began the interview by explaining:

> You definitely have a choice as to whether or not you want to talk to me, ok? I do have some questions for you. If you don't want to answer any of them, or some of them, you just let me know.

In response, Osborn started to discuss his history of downloading adult pornography. Moret stopped Osborn and explained:

> Before we get into any of that, though, I just, I want to make sure you understand . . . you do not have to talk to me. If at any time during this interview you decide you don't want to talk to me anymore, you let me know and we're out of here.

Osborn confirmed that he understood he could terminate the interview at any time. At that point, Moret commenced with the substance of the interview.

The interview was investigatory in nature. Moret conducted the interview alone. She was dressed in plain clothes and unarmed. The video recording of the interview shows Moret sat in front of a desk diagonally from Osborn, who sat adjacent to the desk. Osborn had an unobstructed path to the door. Moret was calm and asked, primarily, open-ended questions. At one point during the

interview, Osborn had a coughing spell. Moret left Osborn alone in the interview room for several minutes. The video shows Osborn vomited into a trash can in her absence. When Moret returned to the room, Osborn told Moret he was nervous. He did not request to discontinue the interview. In total, the interview lasted approximately one and one-half hours. During the interview, Osborn confessed to viewing "child pornography" multiple times on his computer.

At the conclusion of the interview, Osborn was not arrested. Instead, officers drove him and his father back to their residence. From there, the Osborns drove themselves to the hospital to seek medical attention because they were not feeling well.

While Moret interviewed Osborn, the remaining officers completed their search of the Osborns' residence. During the search of the home, the officers seized a computer located in Osborn's bedroom. Detective Schmitz of the Cedar Rapids Police Department created a bit-for-bit forensic image of the two hard drives contained in the computer. Schmitz conducted a forensic analysis of the hard drives and found twenty-eight video and image files depicting a minor engaging in a prohibited sexual act. In addition, search history information showed the computer's user searched for files with the search term "PTHC," which is commonly understood by persons who create, disseminate, and seek depictions of minors engaging in prohibited sexual acts to mean "preteen hard core."

The State charged Osborn with twenty-eight counts of possession of a visual depiction of a minor engaging in a prohibited sexual act or simulation of a prohibited sexual act, in violation of Iowa Code section 728.12(3). Before trial, Osborn moved to suppress his interview with Moret on the ground the interview

was obtained in violation of his *Miranda* rights.  The district court found Moret more credible on the disputed issues and denied the motion on the ground Osborn was not in custody within the meaning of *Miranda* doctrine.  The matter was tried to the bench.  The State voluntarily dismissed two counts due to uncertainty regarding the ages of the persons depicted.  The district court found Osborn guilty of the remaining twenty-six counts and sentenced Osborn to an indeterminate term of incarceration not to exceed six years.

## II.

In his first claim of error, Osborn contends the district court erred in denying his motion to suppress the police interview allegedly obtained in violation of Osborn's *Miranda* rights.

## A.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  The traditional understanding of the Fifth Amendment only required the government to establish the voluntariness of a confession before it could be admitted into evidence against a criminally accused.  *Miranda*, however, "changed the focus of much of the inquiry."  *Dickerson v. United States*, 530 U.S. 428, 434 (2000).  The *Miranda* Court "concluded that the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be 'accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself.'"  *Id.* at 435 (quoting *Miranda*, 384 U.S. at 439).  Because of this concern, the *Miranda* Court constructed a prophylactic rule that "established that the admissibility in evidence of any statement given

during custodial interrogation of a suspect would depend on whether the police provided the suspect with" certain warnings or advisories. *See id.* "[T]he person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444.

Not every confession obtained absent the *Miranda* warnings is inadmissible. "[P]olice officers are not required to administer *Miranda* warnings to everyone whom they question." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). "*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited." *Id.* If a defendant is not in custody, "*Miranda* inquiry is not triggered." *State v. Davis*, 446 N.W.2d 785, 788 (Iowa 1989).

"[A] suspect is in custody upon formal arrest or under any other circumstances where the suspect is deprived of his or her freedom of action in *any* significant way." *State v. Ortiz*, 766 N.W.2d 244, 251 (Iowa 2009). In determining whether a suspect is "in custody," we do not look to the suspect's subjective perception of the relevant events. *See State v. Bogan*, 774 N.W.2d 676, 680 (Iowa 2009). Instead, the test is an objective one: whether a reasonable person in the suspect's place would believe he is in custody. *See Ortiz*, 766 N.W.2d at 251.

To guide our analysis, our case law has identified four non-exclusive factors that bear on the issue of whether a suspect is in custody: "1) the language used to summon the individual; (2) the purpose, place, and manner of interrogation; (3) the extent to which the defendant is confronted with evidence of her guilt; and (4)

whether the defendant is free to leave the place of questioning." *State v. Countryman*, 572 N.W.2d 553, 558 (Iowa 1997); *accord State v. Tyler*, 867 N.W.2d 136, 172 (Iowa 2015); *State v. Miranda*, 672 N.W.2d 753, 759 (Iowa 2003).

### B.

We review constitutional issues, including *Miranda* violations, de novo. *See State v. Schlitter*, 881 N.W.2d 380, 388 (Iowa 2016); *State v. Jackson*, 878 N.W.2d 422, 428 (Iowa 2016); *Countryman*, 572 N.W.2d at 557. Whether a suspect was in police custody for *Miranda* purposes is a mixed question of law and fact. *Thompson v. Keohane*, 516 U.S. 99, 112–13 (1995). We consider the totality of the circumstances, taking into account the entire record. *See Schlitter*, 881 N.W.2d at 388. However, we grant weight "to the trial court's findings of fact . . . because that court had an opportunity to assess the credibility of the witnesses." *State v. Morgan*, 559 N.W.2d 603, 608 (Iowa 1997).

### C.

In applying the facts of this case to the controlling standards, we first consider the facts and circumstances of how Osborn was summoned to the police interview, including the specific language used. *See Schlitter*, 881 N.W.2d at 396. Here, the officers arrived at Osborn's residence in plain clothes. *Cf. State v. Smith*, 546 N.W.2d 916, 924 (Iowa 1996) (finding the fact that officers "were dressed casually in civilian clothes" supported a determination that the suspects were not in custody). Moret asked Osborn if he was "willing" to be interviewed at the police station, and Osborn stated he was. This demonstrates Osborn agreed to be interviewed at the police station and was not compelled to do so. *See State v. Cavins*, No. 10–0880, 2011 WL 1136625, at *3 (Iowa Ct. App. Mar. 30, 2011) ("The

language used to summon the defendant was not forceful, threatening or coercive. The defendant was merely asked if he would accompany the police officer to the police station and the defendant voluntarily agreed."). Moret drove the Osborns to the station in an unmarked car, and the Osborns were not handcuffed. *See Tyler*, 867 N.W.2d at 172 (concluding that defendant was not in custody despite the fact that officers transported her to the police department for an interview); *State v. Cam*, No. 10-0953, 2011 WL 1136456, at *5 (Iowa Ct. App. Mar. 30, 2011) (finding the fact that defendant was not handcuffed supported a conclusion that he was not in custody); *State v. Davis*, No. 08-1942, 2009 WL 4116322, at *5 (Iowa Ct. App. 2009) (concluding defendant was not in custody when he "was not handcuffed or subject to any physical restraint."). Critically, Robert requested Moret transport him and Osborn to the station because he did not want to drive. When considered as a whole, the facts and circumstances giving rise to the interview, including the language used to initiate the interview, demonstrate Osborn's freedom was not restrained in any significant way.

The purpose, place, and manner of the interview also militate against concluding Osborn was in custody. "In examining the purpose, place, and manner of an interrogation, we examine factors including the number of persons conducting the questioning, the number of breaks taken during the questioning, the availability of restroom breaks or other breaks, and the type of questioning in which those conducting the interview engage." *Tyler*, 867 N.W.2d at 172–73. The interview room was unlocked. *See Cam*, 2011 WL 1136456, at *5 (concluding defendant was not in custody when he "was never placed in a locked room"). Moret left Osborn alone in the room on several occasions. Osborn left the interview

room unaccompanied on at least one occasion. Moret conducted the interview alone. *See State v. DeGroot*, No. 16-0643, 2017 WL 5178985, at *3 (Iowa Ct. App. Nov. 8, 2017) (finding the fact that defendant was only interviewed by one officer supported a conclusion that the defendant was not in custody). She was unarmed at the time. *See State v. Walker*, No. 12-10742013, 2013 WL 2145989, at *1 (Iowa Ct. App. May 15, 2013) (finding that the fact that the interviewing officer did not have a weapon displayed supported the conclusion the the defendant was not in custody). Her demeanor was relaxed and calm. *See State v. Hull*, No. 12-2165, 2014 WL 69750, at *2 (Iowa Ct. App. Jan. 9, 2014) (concluding that the defendant was not in custody when "[t]he questioning was casual"); *Walker*, 2013 WL 2145989, at *1 (concluding that defendant was not in custody when the tone of the interview was "conversational"). Moret's questions were open-ended. *See Cavins*, 2011 WL 1136625, at *3 (concluding the defendant was not in custody when "[t]he questioning was open ended"). Most important, Moret repeatedly and clearly informed Osborn he had a choice to participate in the interview and could terminate the interview at any time. *See United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990) ("The most obvious and effective means of demonstrating that a suspect has not been 'taken into custody or otherwise deprived of . . . freedom of action,' *Miranda*, 384 U.S. at 444 [ ], is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will. Where a suspect has been so advised, custody has frequently been found to not exist." (internal citation omitted); *see, e.g.*, *Hull,* 2014 WL 69750, at *2 (concluding defendant was not in custody when interviewing officer told him, "[A]t any point in time you're free to walk out that door") (alteration in original); *Walker*, 2013 WL

2145989, at *1 (finding that a defendant was not in custody when an officer told him, "[Y]ou're free to leave, you're not under arrest"); *State v. Vasquez*, No. 10-0085, 2011 WL 2089778, *3 (Iowa Ct. App. May 25, 2011) (concluding that defendant was not in custody when he was informed that "he was free to leave"). The fact Osborn had an upset stomach during the interview does not turn a non-custodial interview into a custodial interview. For example, in *State v. Tyler,* the court found the defendant was not in custody during an interview conducted the day after she gave birth and while she was in medical distress. *Tyler*, 867 N.W.2d at 174.

The third *Countryman* factor also shows Osborn was not in custody within the meaning of our caselaw. Here, the police did not confront Osborn with evidence of his guilt. Moret explained an investigation had traced "child porn" images to a computer associated with the IP address associated with Osborn's residence. She further explained, "Anything you've done, on that computer, is going to be laid out crystal clear to anybody who wants to look at it." However, the the interview was investigatory and not accusatory. Moret posed open-ended questions to Osborn to learn more information. *See Smith*, 546 N.W.2d at 925 (distinguishing questions that confront defendants with evidence of their guilt with questions that "urge the defendants to provide more information"). This was necessary because, at the time of the interview, the police did not possess evidence of Osborn's guilt. At the time of the interview, law enforcement had not yet forensically imaged or anlalyzed Osborn's computer. In addition, the police had not yet determined whether the culpable party was Robert, Osborn, or other persons with access to the computer. Further, Moret did not presume that Osborn

was guilty. She told Osborn, "Until it's proven different, I'm going to believe what you say." *Cf. State v. Itoh*, No. 09-0811, 2010 WL 1578527, at *3 (Iowa Ct. App. Apr. 21, 2010) (concluding the defendant was in custody when "the officers repeatedly told the defendant they already knew what happened"). Because Osborn was not confronted of evidence of his guilt, this factor weighs in favor of concluding Osborn was not in custody.

Finally, the fourth *Countryman* factor—whether the defendant was free to leave the place of questioning—weighs strongly against any finding Osborn was in custody. As noted above, Moret repeatedly told Osborn it was his choice whether to continue the interview. She told him he could leave when he wanted and that she would escort him out. When Osborn began to feel ill, Moret stepped out of the room and told Osborn to inform her if he needed anything. Osborn left the room unaccompanied. *See State v. Davis*, No. 01-0477, 2002 WL 987881, at *2 (Iowa Ct. App. May 15, 2002) (finding the fact the suspect left the police station for a cigarette break and returned to continue the interview supported a conclusion that he was not in custody). At the end of the interview, Moret did not place Osborn under arrest. *See Cam*, 2011 WL 1136456, at *5 ("Not only was [defendant] free to leave the police station he voluntarily entered, he actually did leave the police station at the conclusion of all the interviews."). Instead, law enforcement officials took him back to his residence.

Considering the totality of the circumstances under the four *Countryman* factors, we conclude Osborn was not in custody during the police interview. The district court did not err in denying the defendant's motion to suppress evidence.

III.

We next address Osborn's challenge to the sufficiency of the evidence supporting his convictions. The district court found Osborn guilty of twenty-six counts of possession of visual depictions of minors engaging in prohibited sexual acts, in violation of Iowa Code section 728.12(3). Although Osoborn has styled his claim as a challenge to the sufficiency of the evidence, his actual challenge appears to be a legal one. Osborn contends the statute requires the State to prove, as an element of the offense, that he actually viewed each visual depiction.

Osborn's contention that the statute requires proof the defendant actually viewed each visual depiction is without merit. Interpretation of a statute involves the determination of the meaning of the words used in the statute. "When we interpret a statute, our goal is to determine legislative intent. To determine legislative intent, we look at the words the legislature chose when it enacted the statute, not the words it might have chosen." *State v. Pettijohn*, 899 N.W.2d 1, 15 (Iowa 2017) (internal citation omitted). The statute provides: "It shall be unlawful to knowingly purchase or possess a visual depiction of a minor engaging in a prohibited sexual act or the simulation of a prohibited sexual act." Iowa Code § 728.12(3). "'Knowingly' means being aware of the character of the matter." Iowa Code § 728.1(2); *accord State v. Zieman*, No. 12-0575, 2013 WL 988857, at *9 (Iowa Ct. App. Mar. 13, 2013). The statutory text is plain and unambiguous. The plain language of the statute requires only proof of knowing possession and nothing more. There is no language in the statutory text that could be interpreted to require the State to prove, as an element of the offense, the defendant actually viewed the visual depiction. *Cf. United States v. Edmiston*, No. 08-5657, 2009 WL

1066782, at *2 (6th Cir. April 22, 2009) (concluding that, under federal statute, "actually viewing [a depiction of a minor engaging in a prohibited sexual act] is not an element of the crime [of knowing possession]").

As a matter of statutory interpretation, Osborn appears to recognize the statute is plain and unambiguous and no language in the text of the statute supports his argument that actual viewing is an element of the offense. In support of his argument, however, Osborn contends the statute should nonetheless be construed to require actual viewing as an element of the offense. The construction of a statute involves the process of determining the statute's legal effect. Osborn relies on a statutory change to support his argument.

In 2007, Iowa Code section 728.12(3) read: "It shall be unlawful to knowingly purchase or possess a negative, slide, book, magazine, *computer*, computer disk, or other print or visual medium, or an electronic, magnetic, or optical storage system, or any other type of storage system which depicts a minor engaging in a prohibited sexual act . . . ." Iowa Code § 728.12(3) (2007) (emphasis added). In *State v. Muhlenbruch*, the supreme court held that possession of a computer containing multiple visual depictions of minors engaging in prohibited sexual acts constituted only one crime. *See* 728 N.W.2d 212, 215 (Iowa 2007). In response to the court's holding in *Muhlenbruch*, the General Assembly amended section 728.12(3) to its current form. *See* 2012 Iowa Acts ch. 1057 § 8. The statutory change related only to the unit of prosecution for the offense, changing the unit of prosecution from the item containing the depiction to the depiction itself. Nothing in the statutory change added an additional element of actual viewing to the statute. We thus reject Osborn's proposed construction of the statute.

Giving Osborn the benefit of the doubt, we also construe his arugment as a challenge to the evidence. Osborn's argument could be construed to mean that the State cannot show, as a matter of law, that he knowingly possessed the visual depictions unless it can show he viewed the visual depictions. That claim is a challenge to the sufficiency of the evidence regarding knowing possession with respect to each count. "In reviewing challenges to the sufficiency of evidence supporting a guilty verdict, courts consider all of the record evidence viewed 'in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence.'" *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012) (quoting *State v. Keopasaeuth*, 645 N.W.2d 637, 640 (Iowa 2002)). This court must uphold the district court's verdict if that verdict is supported by substantial evidence. *See State v. Jorgensen*, 758 N.W.2d 830, 834 (Iowa 2008); *State v. Nitcher*, 720 N.W.2d 547, 556 (Iowa 2006). "Evidence is substantial if it would convince a rational trier of fact the defendant is guilty beyond a reasonable doubt." *Jorgensen*, 758 N.W.2d at 834.

Osborn's challenge to the sufficiency of the evidence fails because it does not recognize that "circumstantial evidence [can be] equally as probative as direct." *State v. Meyers*, 799 N.W.2d 132, 138 (Iowa 2011). Thus, while Osborn is certainly correct in claiming the State could show knowing possession by proving Osborn viewed the prohibited depictions, *see, e.g., State v. Schooley,* 804 N.W.2d 105, 108 (Iowa Ct. App. 2011) ("D.S. gave a clear account of the multiple times she witnessed her father viewing pornographic depictions of young girls."); *State v. Coope*r, No. 07-1988, 2009 WL 139520, at *2 (Iowa Ct. App. Jan. 22, 2009) (using file timestamps to show when depictions were opened to prove knowing

possession), he is as certainly incorrect in contending the State cannot prove knowing possession, as a matter of law, in the absence of such direct evidence.

Here, when the evidence is viewed in the light most favorable to the verdict, there is sufficient circumstantial evidence to prove the defendant knowingly possessed twenty-six visual depictions of a minor engaging in a prohibited sexual act. The depictions were contained on a computer in Osborn's room. Osborn was the only person with access to the password-protected computer. Forensic analysis showed the person who used the computer used search terms designed to find visual depictions of minors engaging in prohibited sexual acts, such as "PTHC" (preteen hardcore). Many of the files found on the computer matched the search terms. For example, one file was named: "!!!New!!! (PTHC) Linda a Little Extra217.avi." Another file was named: "PTHC New 2014!!9 YO Elsa Waiting in Doggy Style Position.jpg." In addition to the file names containing the term "PTHC," other files had names that revealed the character of the file. For example, one file was named: "alicia 10 yo pthc little girl loves adult sex.avi." Another was entitled: "12 years old boy fuck little girl.jpg." Some of the files were downloaded and stored on Osborn's computer for years. From this fact, the district court could have inferred Osborn knew of the existence of the files and intended to retain them. This finding was supported by Osborn's expert witness. Specifically, Osborn's expert witness testified the files at issue were not contained in the shared folder or download folder of the computer and were moved to other files on separate hard drives:

> Q: Do you know were all of the files in that download file or were they in other files as well? A: Well, there were files on two

different devices, . . . so they weren't in the same directory. They were images and videos on two separate hard drives.

Q: So to move it from the download file to some place else, the user has to do that physically? A: Correct.

Q: So, then, within a certain level of certainty, couldn't you say that each of the images that were found Mr. Osborn had moved? A. I don't know who's using the computer. But generally a user in front of that computer would have been the one that moved them.

Q: A user from that computer . . . moved them? A: Correct.

Q: And if Mr. Osborn says he's the only one who had access to that computer, he was the only one with the password, what does that lead—lead you to conclude? A: That it was likely that Mr. Osborn moved the files.

See State v. Manning, No. 13-1111, 2014 WL 5243347, at *6 (Iowa Ct. App. Oct. 15, 2014) (finding sufficient evidence of constructive possession of visual depictions of minors engaging in a prohibited sexual act based on the location of a flash drive and the drive's contents). From this testimony, the district court could have inferred Osborn intentionally moved files froom a shared or download folder to separate files on different hard drives. This supports the finding Osborn exercised knowing control, or possession, of the files. And lastly, Osborn admitted to Moret that he viewed multiple files containing "child pornography" on multiple occasions.

When viewed in the light most favorable to the district court's verdict, substantial circumstantial evidence supports a finding that Osborn knowingly possessed each image. We reject the defendant's challenge to the sufficiency of the evidence.

## IV.

In his last claim, Osborn argues the district court abused its sentencing discretion in two respects. Osborn claims the sentencing court abused its discretion in assuming Osborn viewed each of the depictions. He also argues the

sentencing court did not give an adequate statement of reasons for the imposition of consecutive sentences.

We address Osborn's first claim. At sentencing, the district court referenced the troubling nature of the depictions. Osborn contends the troubling nature of the depictions was irrelevant to sentencing in the absence of proof he actually viewed the depictions. As a factual matter, the claim fails. There was strong evidence Osborn viewed the depictions, including his confession to Detective Moret that he viewed "child pornography" on multiple occasions. As a legal matter, the troubling nature of the depictions was a relevant consideration even in the absence of proof Osborn actually viewed the depictions. Osborn sought out and retained the depictions. As a consumer of prohibited content, he is a market participant driving demand for the creation of prohibited content. These crimes are not victimless. The sentencing court stressed that "to call this a victimless crime is also totally wrong. Somebody paid a price for this. People using [visual depictions of minors engaging in prohibited sexual acts] make these kids pay a price for it." We find that the district court did not abuse its discretion by considering the "troubling nature" of the depictions, regardless of whether the State proved that Osborn viewed each image.

We next address Osborn's contention the district court failed to give adequate reasons for the imposition of the sentences. When the court sentences a defendant, "The court shall state on the record its reason for selecting the particular sentence." Iowa Ct. R. 2.23(3)(d). This statement need not be expansive. "[T]erse reasoning can be adequate when we know the statement in the context of the record demonstrates what motivated the district court to enter a

particular sentence . . . ." *State v. Thacker*, 862 N.W.2d 402, 410 (Iowa 2015); *see also State v. Carberry*, 501 N.W.2d 473, 478 (Iowa 1993) (finding an "extremely terse" statement was adequate when "[s]uch brevity . . . does not necessarily handicap our review of the sentencing discretion").

Here, the district court grouped the convictions into three categories and imposed consecutive sentences of two years for each category. The court stated:

> The consecutive sentences, I believe it amounts to six years, is based on not picking out a few counts, but during the course of the ruling the Court is aware that certain of the offenses were troubling. Extremely troubling. Others were a lot more than extremely troubling and a lot, lot more troubling. Just down right unimaginable fits in the third category, which was the last I believe four counts. I did run those consecutive due to that. Some of those go really way, way afield from what can be considered appropriate behavior in any country. That's the reasons for the sentence, sir.

The district court's statements in the context of the record provides sufficient reasons to inform this court of the basis of the sentence. The images that Osborn possessed ranged from depictions of children exposing their genitals to depictions of children being forced to perform sex acts on adults. The judge divided the depictions into three categories based on the content of the depictions and assigned consecutive sentences for each category. While the court did not laboriously explain its reasoning for the categorical placement of each individual depiction, it did explain the overall reasoning for the categorization. In short, the district court categorized the counts based on its gradation of the seriousness of the offensive conduct. Imposing consecutive sentences for perceived distinctions between the conduct underlying separate offenses is permissible. We find the district court's statement of reasons was adequate.

IV.

For the reasons outlined above, we affirm the defendant's convictions and sentences.

**AFFIRMED.**

Scott, S.J., concurs; Danilson, C.J., concurs specially.

**DANILSON, Chief Judge** (concurring specially)

I specially concur to acknowledge the issue of whether Osborn was in custody is a close question. The majority fails to explain that when Osborn's father entered the bedroom to wake him, two officers followed. When Osborn got up from his bed, he indicated he had to use the restroom. One of the officers told Osborn that he could "pee" but he would have to wait until he was at the police station to have bowel movement. Such a comment could lead any reasonable person to believe they were not given a choice to go to the police station. However, the four factor test to determine if someone is in custody requires consideration of "(1) the language used to summon the individual; (2) the purpose, place, and manner of interrogation; (3) the extent to which the defendant is confronted with evidence of her guilt; and (4) whether the defendant is free to leave the place of questioning." *State v. Countryman*, 572 N.W.2d 553, 558 (Iowa 1997). Thus, the language used to summon Osborn to the police station is only one factor to consider.

I disagree with the majority that Osborn was not confronted with evidence of guilt. First, Osborn knew a search warrant had been obtained and his home was being searched. Second, Osborn was informed law enforcement officials had information that child pornography had been accessed on a computer in the house. The details of the forensic analysis were not necessary to confront Osborn with evidence of guilt.

Notwithstanding these facts supporting the conclusion Osborn was in custody, as soon as Osborn arrived at the police station the officer informed Osborn he could stop the interview and leave at any time. In fact, when Osborn stated to the officer that he did not think he had a choice in coming to the police

station, the officer explained he did have choice and did not have to talk to the officer. I also find it significant that Osborn was transported home after the interview. Considering all of these factors, I concur in this close decision. I would add, if *Miranda* rights are not required in circumstances such as occurred here, the officer should use the phrase, "you are free to go" rather some slang version such as used here, "we're out of here."