# IN THE COURT OF APPEALS OF IOWA

No. 23-1468
Filed December 4, 2024

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**FREDERICK LEE HAWKINS III,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Story County, Steven P. Van Marel, Judge.

The defendant appeals his convictions and sentences for three counts of assault with intent to commit sexual abuse. **CONVICTIONS AFFIRMED; SENTENCES REVERSED IN PART AND REMANDED WITH DIRECTIONS.**

Martha J. Lucey, State Appellate Defender, and Vidhya K. Reddy, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Zachary Miller, Assistant Attorney General, for appellee.

Heard by Greer, P.J., and Schumacher, Badding, Chicchelly, and Buller, JJ.

**GREER, Presiding Judge.**

After investigating reports of unwanted behavior involving three different women, Frederick Lee Hawkins III was charged of three counts of assault with intent to commit sexual abuse for his conduct on May 13, 2022. After a bench trial, the district court found him guilty and sentenced him to three consecutive two-year terms, one term for each count. He now appeals, claiming (1) there was insufficient evidence he intended to commit a sex act to find him guilty of two of the charges against him, (2) given his mental-health issues, he was incapable of forming the specific intent to commit any of the three charged counts, (3) the arresting officers violated Hawkins's *Miranda* rights so his statements during his interrogation should have been suppressed, and (4) the court failed to articulate adequate reasons for imposing consecutive sentences. We affirm the convictions, reverse the sentences in part, and remand for the limited purpose of addressing the consecutive sentence component of the court's sentencing decision.

## I. Background Facts and Proceedings.

Food at First, an organization dedicated to feeding the hungry in Ames, operates out of a church that is located directly across the street from the Ames Police Department. On May 13, 2022, Officer Dilok Phanchantraurai was dispatched to the church after receiving reports that a man inappropriately touched three women. Upon arrival, the director of the organization described what occurred and directed the officer to an upstairs alcove, where Hawkins was standing, sandwiched between an open door and a wall. The officer and an unidentified volunteer requested that Hawkins move from behind the door and sit on a nearby pew or bench. There, Officer Phanchantraurai asked Hawkins several

questions, confronted him with the general allegations against him, and called for backup. A second officer arrived on scene. After their conversation, Officer Phanchantraurai proceeded to go downstairs, gathering general information and obtaining statements from two of the three women involved. The third woman had already left for work but gave a statement later that night.

Those statements and the investigation were described at trial as follows. Hawkins first approached M.B. M.B. entered a stairwell to leave, holding a cup of coffee and two bags, after finishing her meal. She immediately felt another individual behind her, later identified as Hawkins. After asking Hawkins to go in front of her, which he declined, she started to climb the stairs. At the top step, Hawkins falsely told M.B. she had "chocolate or something" on her pants. He then, without consent, started rubbing her buttocks. After taking one more step to the landing, Hawkins grabbed M.B. around her waist, in a tight bearhug. She said something along the lines of, "Don't. Don't. Stop. Stop," with an escalating sense of urgency, ultimately yelling in the stairwell. Hawkins continued to hold her against himself, repeating "please," and started "humping" her. M.B. could feel his erection against her buttocks. Hawkins, while thrusting against her, stuck his hands down her pants, inside her underwear, to her "hair line." At this time, a witness, Rofin, walked into the stairwell and ascended to the stairway landing; yet Hawkins continued to hump M.B. It was only after another women, C.C., responding to "a commotion," came into the stairwell that Hawkins stopped the "humping."

But as C.C. passed Hawkins on the stairs, Hawkins "slapped" her on the buttocks with either an open hand or his forehand. C.C. testified that Hawkins

remained quiet before, during, and after the slap; he simply "stood there." After the nonconsensual touching or "slap," C.C. told him to "stop it." C.C. walked away with M.B., helping her leave to get to work. After C.C. left Hawkins's presence, she reported the incident to the director of the food program.

Shortly after, the director confronted Hawkins as he was attempting to enter the elevator occupied by a third woman, E.M. The director stopped the elevator door from closing and entered, all while admonishing Hawkins for his earlier behavior. As she was admonishing Hawkins, Hawkins brushed from E.M.'s upper thigh to the small of her back with his fingertips, touching her buttocks from the bottom to the top. When the director realized what was happening, she told him to stop. Hawkins responded in a quiet voice, described as "sad or scared," and repeating the words "Help me. Help me. Help me." At the time, the director observed Hawkins with his hand on his crotch.

After Officer Phanchantraurai questioned the women and witnesses, he placed Hawkins under arrest. At no point in the questioning, before the arrest, or while Hawkins was walking to the police station was Hawkins advised of his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S 436, 444 (1966).

Before trial, on August 25, 2022, Hawkins moved to suppress information gained from the officer's questioning, arguing the officer violated the principles articulated in *Miranda*. The officer's body camera video showing the exchange between the officers and Hawkins was also made a part of the record. At the conclusion of the suppression hearing, the court found the officers did not violate *Miranda* because Hawkins had not yet been taken into custody when he made statements to the police.

In September, Hawkins moved for a competency hearing, as his counsel alleged that Hawkins was acting in an irrational manner, unable to fully appreciate the nature of the charges against him and the proceedings and could not fully participate in his defense. After a hearing, the court ordered a psychiatric competency evaluation, pursuant to Iowa Code section 812.3 (2022). After the evaluation was completed, on December 9, Hawkins was found not competent to stand trial but capable of restoration. After completing the court-ordered treatment, in April 2024, the court found Hawkins was competent and proceedings should resume.

At trial, Hawkins called two expert witnesses, Dr. Tracy Thomas, a forensic psychologist, and Dr. Gary Keller, a psychiatrist at the Iowa Medical and Classification Center where Hawkins had been treated for three weeks. Neither could provide a definitive final diagnosis, but as a differential diagnosis,[1] Dr. Keller opined Hawkins had a psychotic disorder, not otherwise specified. Dr. Keller acknowledged that one of the doctors involved in the competency restoration did not feel Hawkins suffered from any psychotic disorder and instead there might be concerns of a personality disorder, which Dr. Keller did not rule out.

With more definitive opinions, Dr. Thomas pointed to a delusion that Hawkins described to her that involved looking into the sun that helped form her opinions. As explained by Hawkins to Dr. Thomas: "looking into the sun does something to your eyes. It provides energy that goes into your body into different

---

[1] Dr. Keller described "a differential diagnosis is, again, ideas, just as kind of train of thought for myself to review, for other staff that are doing the chart to kind of pay attention and look at."

organs. Your eyes sweat. It mixed with other things in your body and tells your body if you have something like a sexually transmitted disease, and then you can clear it out by being in the heat and in the sun." After she evaluated him, Dr. Thomas opined that her diagnosis "at this point" was Hawkins suffered from an unspecified psychotic disorder and that Hawkins would have been unable to form specific intent related to the charged crimes.

In contrast, the State's rebuttal expert, Dr. Rosanna Jones-Thurman, opined Hawkins was not suffering from a psychotic disorder but had symptoms of an antisocial personality disorder, often seen with persons involved in criminal activity. She reviewed Hawkins's history involving previous legal issues and arrests along with his records and the body camera footage from the day of the incidents. After conducting an evaluation with Hawkins that included some testing, Dr. Jones-Thurman ultimately opined that she "did not think that [Hawkins] was suffering from a diminished responsibility" and he had the capacity to form specific intent at the time of the offenses. During trial, an abridged version of the officer's questioning, captured on body camera video, was also admitted into evidence for the court to view.

At the conclusion of evidence, the court found Hawkins guilty of three counts of assault with intent to commit sexual abuse in violation of Iowa Code sections 709.1 and 709.11(3). At sentencing, the court sentenced Hawkins to three, two-year terms of incarceration to be served consecutively and a special sentence, under Iowa Code section 903B.2, for a period of ten years. Hawkins must also register as a sex offender upon his release from prison. Hawkins appeals from his convictions and sentences.

**II. Discussion.**

Hawkins raises four challenges.  He claims there was insufficient evidence he intended to commit a sex act to find him guilty of assault with intent to commit sexual abuse on counts II (involving C.C.) and III (involving E.M.) and that there was insufficient evidence to show that he could form specific intent on the day of his offense as to all three counts.  He also claims that the arresting officers violated his constitutionally protected rights, as set forth in *Miranda*, 384 U.S at 444.  Finally, he claims the sentencing schema, three consecutive sentences of two years, was illegal because the court did not articulate why the sentences were consecutive, as opposed to concurrent.  We assess each claim.

**A.  Sufficiency of the Evidence.**

We review sufficiency-of-the-evidence challenges for errors at law.  *State v. Crawford*, 974 N.W.2d 510, 516 (Iowa 2022).  Evidence must be assessed "in the light most favorable to the State."  *State v. Donahue*, 957 N.W.2d 1, 7 (Iowa 2021) (citation omitted).  "Evidence is sufficient to support a conviction if, viewing it in the light most favorable to the prosecution, 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *State v. Polly*, 657 N.W.2d 462, 467 (Iowa 2003) (citation omitted).

**i.  Ability to Form Specific Intent.**

We start with Hawkins's challenge that as to all three counts, when viewing the evidence in the light most favorable to the State, no rational fact finder could conclude that he had the capacity to form specific intent.  This challenge goes directly to Hawkins's claims related to his competency on May 13, 2022.  Hawkins asserts he was experiencing psychotic symptoms and disorganized thinking that

prevented him from developing specific intent during the commission of the offenses. We review the record to determine if sufficient evidence exists to convict Hawkins of assault with intent to commit sexual abuse.

As in many of these cases, there was a battle of expert opinions. Hawkins presented two experts, Dr. Keller and Dr. Thomas. Both professionals testified Hawkins had symptoms consistent with a psychotic disorder. Dr. Thomas pointed to Hawkins's delusions she observed during her evaluation and opined that Hawkins would not have had the capacity to form specific intent for the offense because of his disordered thinking. The State's rebuttal expert, Dr. Jones-Thurman, testified it was her opinion that Hawkins's symptoms were a result of his antisocial personality disorder and thus he did have the capacity to form specific intent for the offenses on the day of the incidents.

When experts present opposing professional opinions, it is up to the fact finder to weigh the substance of the opinions and decide which, if any, opinions are credible. *See State v. Jacobs*, 607 N.W.2d 679, 685 (Iowa 2000) ("When conflicting psychiatric testimony is presented to the fact finder, the issue of sanity is clearly for the fact finder to decide."). In the instant case, the court had the ability to view the testimony of all the experts, along with the officer's body camera footage showing Hawkins's demeanor on the day of the incidents. The footage showed Hawkins was hiding after the incident, which could mean he knew what he had done was wrong. It was the court's opinion that even with the testimony of the experts, "the evidence is pretty thin as to whether or not Mr. Hawkins has a psychotic disorder, especially back in May of 2022, a long time before he was examined by any experts." This finding largely aligned with the conclusion of

Dr. Jones-Thurman, who opined Hawkins was suffering from an antisocial personality disorder, not a psychotic disorder, and could form specific intent at the time of the offense. "When a case evolves into a battle of experts, we, as the reviewing court, readily defer to the district court's judgment as it is in a better position to weigh the credibility of the witnesses." *Id.* Dr. Jones-Thurman's testimony along with the other evidence related to witness observations and the officer's body camera footage was sufficient evidence for the fact finder to conclude beyond a reasonable doubt that Hawkins was able to form specific intent during the commission of the offenses.

## ii. Specific Intent to Commit a Sex Act.

As the district court acknowledged, once Hawkins's competency to act was established, the State had the burden to show as to each count that Hawkins (1) committed an assault, (2) with the specific intent to commit a sex act, (3) by force or against the will of the victim. *See State v. Beets*, 528 N.W.2d 521, 523 (Iowa 1995). As to the second element, Hawkins claims there was insufficient evidence to support the verdict rendered related to the charges involving C.C. and E.M., arguing that at a minimum, "there must be proof that at the time of the physical contact, [Hawkins] had a specific intent to commit a sex act."

Chapter 709 defines "sexual abuse" as "[a]ny sex act between persons is sexual abuse by either of the persons when the act is performed with the other person in any of the following circumstances . . . [t]he act is done by force or against the will of the other." Iowa Code § 709.1. Sex act is defined as:

> The term "sex act" or "sexual activity" means any sexual contact between two or more persons by any of the following:
> 1. Penetration of the penis into the vagina or anus.

2. Contact between the mouth and genitalia or mouth and anus or by contact between the genitalia of one person and the genitalia or anus of another person.

3. Contact between the finger, hand, or other body part of one person and the genitalia or anus of another person, except in the course of examination or treatment by a person licensed pursuant to chapter 148, 148C, 151, or 152.

4. Ejaculation onto the person of another.

5. By use of artificial sexual organs or substitutes therefor in contact with the genitalia or anus.

6. The touching of a person's own genitals or anus with a finger, hand, artificial sexual organ or other similar device at the direction of another person.

Iowa Code § 702.17. To start, we examine the nature of the contact between Hawkins and C.C. and then Hawkins and E.M. C.C. and E.M., as well as corroborating witnesses, described the nonconsensual assault towards each woman as a "slap," "grab" or "touch" of the buttocks. Unlike the situation with M.B., Hawkins did not come in contact with the genitalia of C.C. and E.M.; all contact was limited to the clothed exterior of the buttocks. *See State v. Martens*, 569 N.W.2d 482, 486 (Iowa 1997) ("[T]he term 'genitalia' broadly describes and includes many organs associated with the reproduction apparatus. Included is the vulva, which includes the symphysis pubis, a prominence covered by hair. Thus, anatomically, pubic hair is included in the term 'genitalia' and is a part of the 'genitalia area.'"); *see also State v. Thede*, No. 15-0751, 2016 WL 5930417, at *3 (Iowa Ct. App. Oct. 12, 2016) (finding contact of an electric razor with the anus qualified as a sex act), *cf. State v. Anderson*, No. 04-1086, 2005 WL 3115469, at *3 (Iowa Ct. App. Nov. 23, 2005) (finding the State did not have to prove the defendant contacted the anus because the defendant used the buttocks as "a substitute for a vagina"—a different alternative for committing a sex act).

Because Hawkins was convicted of the *intent* to commit a sex act with nonconsenting parties, we turn to the intent piece of the statutory puzzle. Iowa courts have previously determined an individual has an intent to commit sexual abuse if:

> The overt act . . .reach[es] far enough towards the accomplishment, toward the desired result, to amount to the commencement of the consummation, not merely preparatory. It need not be the last proximate act to the consummation of the offense attempted to be perpetrated, but it must approach sufficiently near it to stand either as the first or some subsequent step in a direct movement towards the commission of the offense after the preparations are made.

*State v. Radeke*, 444 N.W.2d 476, 478 (Iowa 1989) (quoting *State v. Maynard*, 379 N.W.2d 382, 383 (Iowa Ct. App. 1985)). To show intent, the facts must show, directly or indirectly, Hawkins's actions were a substantial step he took to accomplish a sex act. *See United States v. Carrillo Topete*, 116 F.4th 792, 795 (8th Cir. 2024) ("[A]n attempt to commit sexual abuse . . . requires the same specific intent and a substantial step toward completion of the crime."). It follows then, if Hawkins's offensive contact was not in furtherance of committing a qualified sex act, if his actions and facts surrounding the conduct do not show a desire and the intent of furthering that goal, a reasonable fact finder could not find Hawkins had the intent to commit sexual abuse in violation of Iowa Code section 709.11.

If we silo these three situations, Hawkins concedes that as to M.B. there was sufficient evidence of intent to commit sexual abuse when the facts are viewed in the light most favorable to the State. But Hawkins urges the latter two episodes were "meaningfully different" and only involved "mere touching." An overview of

Hawkins's behavior as to each woman involved after the assault on M.B. is helpful here.

Turning to the circumstances surrounding the contact between Hawkins and E.M. (count III), Hawkins's action of running his hand from E.M.'s thigh, along her buttock, and up towards her waist while at the same time grabbing his crotch provides sufficient evidence for a fact finder to determine Hawkins committed the assault with a specific intent to commit a sex act. Through M.B.'s testimony, it was established that minutes before this assault, Hawkins "humped" her with a "hard on." Then in the elevator while groping E.M.'s buttock area and grabbing his crotch, Hawkins mumbled, "Help me. Help me. Help me." A fact finder could determine that Hawkins was trying to use contact with E.M. to achieve a sex act that he could not finish when interrupted earlier. "[I]ntent is a state of mind difficult of proof by direct evidence. It may, however, be established by circumstantial evidence and by inferences reasonably to be drawn from the conduct of the defendant and from all the attendant circumstances in the light of human behavior and experience." *State v. Kelso-Christy*, 911 N.W.2d 663, 667–68 (Iowa 2018) (citations omitted). We can look to "a sexual comment made by the defendant to the victim, touching in a sexual way, the removal or request to remove clothing, or some other act during the commission of the crime that show[s] a desire to engage in sexual activity, to affirm the conviction." *State v. Casady*, 491 N.W.2d 782, 787 (Iowa 1992). And given Hawkins's behavior with M.B. that transpired just minutes earlier, we conclude there was sufficient evidence to convict Hawkins of assault with intent to commit sexual abuse of E.M. *See State v. Kelley*, No. 06-1356, 2008 WL 4725293, at *2 (Iowa Ct. App. Oct. 29, 2008) (finding substantial evidence on

the record to support a finding of intent to commit sexual abuse when defendant put his hand on victim's inner thigh, struck her on the buttocks, and masturbated in front of her after she told him, "No.").

But the facts, viewed in isolation, involving C.C. (count II) provide a closer question over Hawkins's guilt. A slap on the buttocks, without more, is not itself a sex act. *See generally State v. Paulsen*, No. 10-1287, 2011 WL 3925699 (Iowa Ct. App. Sept. 8, 2011) (finding that the sole act of rubbing the child's back and abdomen was insufficient evidence to justify a conviction of assault with intent to commit sexual assault). As Hawkins argues the contact was very brief, done in the presence of others and not combined with any actions to consummate a sex act as defined by our legislature. In the silo involving C.C.'s experience with Hawkins, cases with similar facts have not found the requisite evidence to establish an intent to commit sexual abuse. For example, in *State v. Mosley*, this court, when comparing different instances of conduct, stated, "[The victim's] claims include no sex acts and arguably only marginally involve any criminal acts. They involve suggestive remarks, slaps on the clothed buttocks, and a claim that [the defendant] saw [the victim] naked through a keyhole." No. 07-0138, 2008 WL 373628, at *3 (Iowa Ct. App. Feb. 13, 2008). In *Mosley*, the behavior at issue was so dissimilar to the previous "serious, forcible sexual assaults, including many years of serial abuse in the form of oral, vaginal, and anal penetration," that the earlier conduct was found to be irrelevant to show a pattern of sexual abuse. *Id.* And when this court found a slap or grab of the buttocks to be evidence of intent, the slap or grab has been accompanied by other sexual behavior. *See State v. Elliott*, No. 22-1592, 2024 WL 3688755, at *1 (Iowa Ct. App. Aug. 7, 2024) ("[The

defendant] put his arm around [the victim], tried to reach up her skirt, rubbed his crotch against her buttocks, bit her neck, and grabbed her buttocks over her clothing while making graphic sexual remarks.").

But here, Hawkins's act of slapping C.C.'s buttocks occurred sandwiched between two events that evidence the intention to engage in sexual activity. And we are not required to look at the assault of C.C. in a vacuum. Similarly, in the context of reviewing convictions for sexual abuse, we are directed to consider "the circumstances surrounding the commission of the act," which "means all the circumstances, subjective as well as objective." *State v. Bauer*, 324 N.W.2d 320, 322 (Iowa 1982) (emphasis removed) (citation omitted). Under certain circumstances intent to commit sexual abuse can be shown by evidence of other similar actions of sexual assault against other victims. *See Casady*, 491 N.W.2d at 785–86. The action of slapping C.C.'s buttock close in time to the assault of M.B. could be viewed as a step towards the accomplishment of a sex act, especially when closely followed by the assault on E.M. "Modus operandi is a distinct pattern or method of procedure thought to be characteristic of an individual criminal and habitually followed by him that is typically relevant to prove identity or lack of consent." *State v. Thoren*, 970 N.W.2d 611, 631 (Iowa 2022) (cleaned up). Our supreme court found a modus operandi to commit sexual abuse in *Casady* when, in 1991, the defendant lured the victim to his car window, grabbed her arms, and attempted to pull her inside his car. 491 N.W.2d at 784. In *Casady*, the court found the facts of the current charge were "equally similar to the 1979 crime [Casady] committed," and the "modus operandi was clearly parallel." *Id.* at 788. Because Casady's actions were interrupted by a family friend of the victim, and the

victim escaped, the court reasoned that if free to continue, Casady would have succeeded in committing sexual abuse in violation of section 709.11. *Id.* Thus, the specific repeated pattern of behavior was enough to show intent. *Id.*

Taken as a whole, a rational fact finder could find that Hawkins's behavior constituted a pattern of groping women during the time he was sexually aroused that constituted a modus operandi to commit sexual abuse. We "view the 'evidence in the light most favorable to the State, including legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.'" *State v. Williams*, 695 N.W.2d 23, 27 (Iowa 2005) (citation omitted). Here, we can infer that Hawkins's behavior over a short period of time focused against three women revealed conduct that went towards his end result—that he intended to engage in sex acts as defined by section 702.17. *See Radeke*, 444 N.W.2d at 478 (noting that while a fact finder may infer the defendant's intent before he commits the "last proximate act to the consummation of the offense," his conduct must be a step in the direction of the offense). We find the totality of the behavior against all three women took a step in the direction of the offense. Substantial evidence supports each of Hawkins's three convictions.

## B. Alleged *Miranda* Violations.

When a violation of a constitutional right is claimed, the standard of review is de novo. *State v. Tague*, 676 N.W.2d 197, 201 (Iowa 2004). Appellate courts "make an independent evaluation of the totality of the circumstances as shown by the entire record." *State v. Breuer*, 577 N.W.2d 41, 44 (Iowa 1998). "We give considerable deference to the trial court's findings regarding the credibility of the witnesses, but [we] are not bound by them." *Tague*, 676 N.W.2d at 201. "In

reviewing the trial court's ruling, we consider both the evidence presented at the suppression hearing and that introduced at trial." *State v. Naujoks*, 637 N.W.2d 101, 106 (Iowa 2001).

Hawkins claims that his constitutional rights under the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 9 of the Iowa Constitution were violated when police officers unlawfully placed him in custody and interrogated him without informing of his rights, as mandated under *Miranda*. 384 U.S. at 444. Under *Miranda*, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* "Custodial interrogation is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *State v. Simmons*, 714 N.W.2d 264, 274 (Iowa 2006) (cleaned up). Here, Hawkins was questioned at the church when Officer Phanchantraurai first found him hiding behind the door in the alcove. We address if Hawkins was in custody or "deprived of his freedom of action in any significant way" for the purposes of *Miranda*. *Id.* (citation omitted).

It is well-settled law that courts must apply an objective test to determine if an individual is in custody for the purposes of *Miranda*: "The test is based on 'objective circumstances, not the subjective belief of the officers or the defendant.'" *State v. Park*, 985 N.W.2d 154, 168 (Iowa 2023) (citation omitted). We ask if a reasonable person in the defendant's situation would believe they were in custody. *State v. Smith*, 546 N.W.2d 916, 921 (Iowa 1996). Courts must take into account

> the totality of the circumstances using four guiding factors . . : "(1) the language used to summon the individual; (2) the purpose, place, and manner of interrogation; (3) the extent to which the defendant is confronted with evidence of her guilt; and (4) whether the defendant is free to leave the place of questioning."

*Park*, 985 N.W.2d at 168 (quoting *State v. Countryman*, 572 N.W.2d 553, 558 (Iowa 1997)).

We review whether Hawkins was in custody after Officer Phanchantraurai found him in the church. Hawkins was standing between an open door and a wall. An unidentified witness moved the open door, telling Hawkins, "Hey buddy, c'mon. Come here," and then Officer Phanchantraurai told Hawkins to "Sit down. Sit down, sir." Hawkins complied, sitting on a nearby bench in an exposed alcove of the church. The officer then asked, "So what's going on tonight?" Hawkins responded, "Nothing." Once the backup officer arrived, Officer Phanchantraurai continued asking Hawkins several questions during an exchange captured on the body camera video. After first urging Hawkins to be the first to tell his side of what happened, Hawkins responded, "I don't know what happened." Officer Phanchantraurai pressed with questions like, "you didn't do anything?" and "you didn't touch any female at all?" With each question, Hawkins answered "no." Hawkins also denied that he "humped" anyone or that he "hit somebody's butt."

This first interaction between Hawkins and the officer falls in line with *State v. Hauan*, where this court highlighted that officers may detain a person of interest or suspect to ask "a moderate number of questions to . . . obtain information confirming or dispelling the officer's suspicions. But the detainee is not obligated to respond.'" 361 N.W.2d 336, 340 (Iowa Ct. App. 1984) (quoting *Berkemer v. McCarty,* 468 U.S. 420, 439 (1984)). The initial questioning did little to confront

Hawkins with the potential evidence against him, but rather, the inquiry could reasonably help clarify the allegations against Hawkins and determine if probable cause existed to arrest him.

We find Hawkins was not in custody at the time this interchange occurred. Evaluating the totality of the circumstances, we first look to "the language used to summon the individual." As the evidence shows, the police did not summon Hawkins to the scene. *See State v. Chambers*, No. 20-1511, 2021 WL 3893906, at *4 (Iowa Ct. App. Sept. 1, 2021) (finding as to the first factor, no custody when police found the defendant "at the scene" and "[n]o one summoned" the defendant). Next, as to the purpose, place, and manner of interrogation, from the police body camera we can see that the tone and manner of questioning was not overtly aggressive. The officer, on multiple occasions, referred to Hawkins as "sir," and told Hawkins that this was his time to talk, pausing for Hawkins to speak. The officer told Hawkins to "Sit down. Sit down, sir." Hawkins voluntarily complied. The language used by the officer was unlikely to signal to a reasonable person that they were being deprived of the freedom to move or act independently. Hawkins matched the officer's pace and overall tone in answering questions. Although the officer did interrupt Hawkins at least twice to ask questions, the officer generally waited for Hawkins to finish responding, often a "no," before asking another question.

The discussion occurred in a space that was carpeted and bright, typical of a church gathering space. *See State v. Tyler*, 867 N.W.2d 136, 173 (Iowa 2015) (considering that the questioning took place in a room that "was carpeted and well lit" when deciding whether a defendant was in custody). The bench was in a public-

facing location, but out of the way of most foot traffic. If either Hawkins or the officer raised their voice, the open staircase and proximity to well-trodden public spaces would all but ensure their conversation was not private. *See Schaul v. State*, No. 18-0799, 2020 WL 1049772, at *7 (Iowa Ct. App Mar. 4, 2020) ("The postconviction court concluded Schaul was not in custody when he was questioned by the deputy at the hospital. The court reasoned . . . he 'was in the emergency room, which is a very public space'. . . ."). Churches are designed as welcoming public spaces, not areas typically used for interrogation by the police.

As to the extent to which Hawkins was confronted with evidence of his guilt, the officer merely repeated the limited information he had at that point and Hawkins denied any knowledge or involvement. Officer Phanchantraurai pressed no further. And finally, although the officer testified that Hawkins was not free to leave, the officer never explicitly told Hawkins he could not leave. A "policeman's unarticulated plan" of future arrest or detainment cannot be included in the analysis of whether an individual was in custody for the purposes of *Miranda*. *See Smith*, 546 N.W.2d at 924. Here, the officers used no restraints, no weapons were drawn, and the environment was not tense. *See Countryman*, 572 N.W.2d at 558 (providing that we "weigh the degree of physical restraint imposed during the interrogation" when determining whether the defendant was in custody). Under the totality of circumstances, we find Hawkins was detained and questioned briefly but not in custody for purposes of *Miranda.*

As both the State and Hawkins agree, when Officer Phanchantraurai returned, Hawkins was arrested and placed in handcuffs. At that point, both parties agree Hawkins was in custody. After Hawkins was placed into custody, he

repeatedly asked the officers "For what?" and "What did I do?" After several iterations of the question, the arresting officer responded, "I'll tell you." At that point, the officer said, "You have the right to explain to the judge," "I was not here," and "Three people describe[d] what you did, so you can talk to the judge about it." Hawkins continued to deny any illegal conduct, and the officer responded, "You touched those females inappropriately. You can deny [it], sir. I have enough probable cause to put you under arrest." Hawkins then told the officers, "Nobody even called the police." A second officer retorted, "How do you think we got here?" Hawkins then offered a series of "I didn't do anything" and other similar sentiments as the officers walked him across the street to the police station. Outside, the officer responded, "Ya know, you have the right to explain to the judge, you said you're not doing anything, 'kay, but it's your word against their words, right. I wasn't here, we were not here." Hawkins responded calmly, "Yes sir, I'm trying to explain to you, I didn't do nothing." The officer returned, "You don't need to explain to me, it doesn't mean anything at this point." At that time, the conversation ceased. If anything, the content of the conversation was designed to shut down responses by Hawkins. There was no post-arrest interrogation. Thus, the protections provided by *Miranda* are not in play here.

We find the facts surrounding Hawkins's questioning by police, arrest, and post-arrest conversation do not support a *Miranda* violation.[2] We agree with the court and affirm the court's suppression ruling.

---

[2] Even if *Miranda* applied to any point in the exchanges between Hawkins and the police, Hawkins failed to identify any statements that were harmful as Hawkins only denied involvement when speaking with the officers. And while the State played part of the body camera footage during the underlying criminal trial, the court did

## C. Resentencing.

In a final challenge, Hawkins urges that the court erred when it ordered his sentences to be served consecutively but provided no reasoning for that decision. The State concedes this point and agrees that the matter be remanded but argues the district court should reconsider only the consecutive sentence portion of the resentencing decision, as the decision to impose incarceration was properly supported. *See* Iowa R. Crim. P. 2.23(2)(g) (requiring the court to "state on the record the basis for the sentence imposed and . . . particularly state the reason for imposition of any consecutive sentence"). We agree with the State, so we reverse Hawkins's sentences in part and remand for resentencing for this limited purpose.

## III. Conclusion.

We find sufficient evidence to find Hawkins formed specific intent and intended to commit a sex act against each of the three women; we also find no *Miranda* violations occurred. We affirm Hawkins's convictions. We reverse Hawkins's sentences in part and remand for the district court only to reconsider whether to impose consecutive or concurrent sentences; we take no position on the proper sentence.

**CONVICTIONS AFFIRMED; SENTENCES REVERSED IN PART AND REMANDED WITH DIRECTIONS.**

---

not rely upon any statements made by Hawkins in its ruling. Any admission of *Miranda* protected statements would be harmless error. *See State v. Peterson*, 663 N.W.2d 417, 431 (Iowa 2003) (finding a harmless error analysis examines the basis on which a fact finder actually rested its verdict).